**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID WOULARD, ATTACK THE SOUND LLC, an Illinois limited liability company, STAN BURJEK, JAMES BURJEK, BERK ERGOZ, HAMZA JILANI, MAATKARA WILSON, ARJUN SINGH, MAGNUS FIENNES, and MICHAEL MELL, each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| SUNO, INC. and UNKNOWN DEFENDANTS, | ) ) ) |
| Defendants. | ) ) |

Case No. 25-cv-12684

District Judge Andrea R. Wood

Magistrate Judge Heather K. McShain

**DEMAND FOR JURY TRIAL**

**FIRST AMENDED COMPLAINT**

Plaintiffs, David Woulard, Attack the Sound LLC, Stan Burjek, James Burjek, Berk Ergoz, Hamza Jilani, Maatkara Wilson, Arjun Singh, Magnus Fiennes, and Michael Mell, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Suno, Inc. ("Suno") and Unknown Defendants, allege as follows:

**NATURE OF THE CASE**

1.     This case challenges Suno's practice of systematically copying and storing works by independent artists to fuel a commercial, mass-market music-generation engine. Suno built its rapidly expanding commercial empire by disregarding the intellectual property rights of the artists it claims to

support. Suno created and sells a product that directly competes in markets where independent artists make their living, such as sync licensing, library and production music, streaming, commissions, and lyric licensing. Suno did not analyze or study various genres and styles, how songs in those genres and styles are harmonized and structured, the characteristic timbres of the instruments and vocalizations in those genres and styles, or anything else. To run this mass-market music generation engine, Suno copied and maintains a centralized library of essentially all music files of reasonable quality taken from online sources without permission, together with text descriptions, using these copies and descriptions to train and operate models that produce outputs replacing licensed music on a large scale.

2.      Plaintiffs are independent musicians and songwriters whose livelihoods depend on licensing and recognition of their works. They have invested time, talent, and resources to create original music, only to see Suno wrongly appropriate and weaponize their work against them. Without the bargaining power of major labels, independent artists face particularly severe and unfair harm from Suno's conduct.

3.      U.S. copyright law gives creators exclusive rights to control how their works are reproduced and used, including sound recordings and musical composition elements. These protections apply to recordings, lyrics, and non-lyrical expressions, such as melodic, harmonic, rhythmic, and arrangement choices. These principles are essential for ensuring that creators are fairly paid for their work, which supports ongoing innovation and cultural development.

2

4.     Suno has admitted to training its models on copyrighted material while claiming the ability to produce "radio-quality" songs that are indistinguishable from human performances. It did not seek permission or pay for the works it copied and retained. Suno hints at "fair use," but copying and storing entire works to build a competing, profit-making music factory is not fair use.

5.     Besides copying entire sound recordings, Suno also copied, tokenized, and indexed lyrics on a large scale. Suno extensively scraped lyric content from sources like Common Crawl, which includes databases such as Genius, AZLyrics, Lyrics.com, and Musixmatch, without securing the necessary licenses for lyric display or reproduction that are readily available in the market.

6.     The claims in this case do not rely on whether outputs match a single work. Liability arises from Suno's unauthorized reproduction, ingestion, and use of specific copyrighted recordings and compositions during pre-training, training, and fine-tuning, as well as from its collection and retention of a centralized library of pirated or otherwise unauthorized copies beyond any technical need. That non-transformative copying is illegal and not justified by fair use.

7.     Suno's commercial success and rapid technological growth, from its initial beta launch in 2023 to reaching 25 million users by early 2025, directly come at the expense of independent artists. Given Suno's swift expansion—gaining tens of millions of users within a year—the harm to

independent artists and small labels is immediate, widespread, and potentially irreversible. Suno actively diminishes the commercial value of original musical compositions and performances by flooding the music market with AI-generated tracks based on unauthorized use of copyrighted works. Its subscription-based business model profits significantly from this infringement, incentivizing users to create and monetize derivative works that directly compete with and displace original, human-created music.

8.     Suno's misconduct extends beyond copyright issues. Suno collected, stored, and exploited biometric identifiers and voiceprints derived from human performances without adhering to the legal safeguards required by the Illinois Biometric Information Privacy Act (BIPA), thereby violating the Act. Suno also misused artists' voices and identities for commercial gain without permission, violating the Illinois Right of Publicity Act (IRPA).

9.     Suno further violated the Digital Millennium Copyright Act by bypassing access controls to obtain works and by removing, altering, or providing false copyright-management information. These actions obstruct attribution, licensing, and enforcement efforts while concealing the origin of the works on a large scale.

10.     Suno's conduct also constitutes contributory and vicarious infringement, deceptive trade practices, and unjust enrichment. Suno intentionally induced and materially contributed to downstream infringements by designing and marketing sound-alike capabilities while controlling its service and reaping a direct financial benefit. Its marketing and positioning are

likely to cause confusion regarding sponsorship, affiliation, or approval, and Suno has unjustly retained the value derived from artists' works.

11.　No technological innovation, regardless of how transformative, can legally or ethically justify widespread infringement or the systematic violation of creators' rights. Suno must follow the same basic legal rules as all market players, especially respecting intellectual property rights that support the creative industries.

12.　Unlike previous lawsuits filed by major music labels, which primarily aim to protect the high-value catalogs of popular artists, this case emphasizes the significant and unequal harm inflicted on independent musicians. Independent artists constitute the majority of music creators but lack comparable financial protections. They depend heavily on licensing revenue, royalties, and recognition of their creative works, and they face especially severe impacts from Suno's unauthorized use and market saturation.

13.　Ultimately, this action serves as an essential test of whether technological progress can ethically and legally coexist with fundamental protections that foster human creativity. It emphasizes the need for accountability and a clear set of rules for the AI era.

**PARTIES**

14.　Plaintiff David "Davo Sounds" Woulard ("Woulard") is a military veteran, an active Chicago Firefighter, and a Chicago-based singer and

songwriter. Woulard co-owns or exercises the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Woulard] (together, the "Woulard Works"). The Registered Recordings include, by way of example: "Bad News" (single), Reg. No. SR0000845765, registered March 25, 2019; and "Prequel to the Sound" (collection of seven songs), Reg. No. SRU001313672, registered March 28, 2018.

15.     Woulard is the principal songwriter and lead vocalist for the Indie R&B band Attack the Sound and is a credited songwriter and copyright owner of the band's releases.

16.     Attack the Sound LLC ("ATS") is an Illinois limited liability company.  ATS manages and represents the artists, creative copywriters, masters, and performers who perform under the Attack the Sound name. Multiple Attack the Sound releases are registered with the U.S. Copyright Office as reflected in Exhibit A-[Woulard].

17.     Since 2019, Attack the Sound has released ten singles and a six-track project, "Love Is War: Packed." Its music is available on major streaming platforms, including Spotify, YouTube, Apple Music, Amazon Music, and Pandora.

18.     Woulard writes and records his vocal performances for Attack the Sound in Illinois.

19.     Attack the Sound maintains a significant social-media presence, including over 15,000 Instagram followers, and actively promotes its releases in the competitive Chicago music market.

20.     Plaintiffs Stan and James Burjek (together, the "Burjek Plaintiffs") are a Shorewood, Illinois-based father-and-son songwriting and recording duo. They've released folk rock and shoegaze music under the names "The Burjek Collective", "Smackin' Billies", and "Pool Deck Duel." Stan is a guitarist, songwriter, and vocalist; James is a multi-instrumentalist.

21.     The Burjek Plaintiffs individually or collectively own, co-own, or exercise the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Burjek] (the "Burjek Works"). Registered sound recordings include, by way of example, "This Road" (album), Reg. No SRU001533131, registered February 8, 2023.

22.     Since 2023, The Burjek Collective, Smackin' Billies and Pool Deck Duel have released multiple singles; the ten-song Smackin' Billies album "This Road" was released in May 2023. Stan is a credited songwriter and copyright owner of all material by The Burjek Collective, Smackin' Billies, and Pool Deck Duel. Their music is available on major streaming platforms, including Spotify, YouTube, Apple Music, Amazon Music, and Pandora.

23.     Stan recorded vocal parts for many of the songs, including specifically the following songs: This Road, Fire Years, What She's Thinking, Who Would You Be, Lights on our Faces, Dirty Them Dogs, Nothing With You, Rock Salt Hill, This Road Pt. 2 (Epilogue), Man on the Radio, Little Bales of

Hay, Perfectly Served. James recorded vocal parts on "How Can You See Love" released by Pool Deck Duel.

24.     All The Burjek Collective, Smackin' Billies and Pool Deck Duel material was recorded at the Burjeks' home studio in Shorewood, Illinois.

25.     Although neither Stan nor James is a full-time musician, their releases have garnered thousands of streams across platforms, and they actively work to expand exposure and streaming revenue.

26.     Plaintiffs Berk Ergoz, Hamza Jilani, Maatkara Wilson, and Arjun Singh (collectively, the "Directrix Plaintiffs") perform as "Directrix", a Chicago-based band. A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by the Directrix Plaintiffs are identified in Exhibit A-[Directrix].

27.     Directrix began as the passion project of Hamza and Berk nearly ten years ago in Dubai. After moving to Illinois to attend the University of Chicago, they joined with Wilson and Singh to write, record, perform, and release music.

28.     In March 2023, Directrix released "The Whale Album," a collection of eight songs recorded in 2023. In July 2025, they released a five-song project, "Halotherapy." Both projects, along with the July 2023 single "(I Don't) Wanna Fall in Love", were recorded in Chicago, Illinois. Berk, Hamza, Maatkara, and Arjun are all listed as credited songwriters and copyright owners of this material.

29.    Directrix distributes its music to major streaming platforms, including Spotify, Apple Music, Amazon Music, YouTube, Pandora, and Tidal, through digital distributor EmuBands.

30.    Members of Directrix recorded vocal parts across these releases, including: Buttermilk (main vocals: Plaintiff Maatkara, backing vocals: Plaintiff Hamza), The Breaching Song (main vocals: Plaintiff Maatkara, backing vocals: Plaintiffs Hamza, Berk, Maatkara), Hell's Breeze (main vocals: Plaintiff Hamza, backing vocals: Plaintiffs Maatkara, Hamza, Berk), Trick Mirror (main vocals: Plaintiff  Maatkara, backing vocals: Plaintiffs Hamza, Maatkara), (I Don't) Wanna Fall in Love (main vocals: Plaintiff Maatkara, backing vocals: Plaintiff Hamza).

31.    Berk, Hamza, Maatkara, and Arjun are all listed as credited songwriters and copyright owners of this material.

32.    While not full-time musicians, the Directrix Plaintiffs have accrued thousands of Spotify streams (and more across other platforms) and earn a modest revenue stream from both streaming and live performances.

33.    Plaintiff Magnus Fiennes is a Los Angeles-based, award-winning composer and producer whose work spans film, television, theatre, and video games. He has composed more than 240 hours of music, including the BBC's hit series "Death in Paradise," which he has scored for 15 seasons and continues to score, and its spin-off "Beyond Paradise," to which he has contributed 4 seasons, with work ongoing. His other notable credits include the

acclaimed dramas "Hustle," "Murphy's Law," and "The Last Enemy," as well as the feature film "Onegin" and the animated project "Casper's Scare School."

34.     Fiennes' achievements include winning Best Music at the Reims International TV Awards for "Five Days" and composing music for hundreds of successful commercial campaigns for brands such as Coca-Cola, Ford, Kraft, and L'Oréal. He has also produced and written for major artists including Shakira, Tom Jones, Lenny Kravitz, Sinéad O'Connor, and the Spice Girls, contributing to hits such as the global number one "Never Ever" by All Saints.

35.     Fiennes created and owns the music rights to "Freefonix," a children's animated series of 40 episodes (BBC Worldwide, 2007). All episodes are available on YouTube. The series features more than 80 songs co-written by Fiennes. Fiennes also composed the music and owns all music publishing and master recording rights for the feature films "Robots" (2024, NEON) and "Pervert's Guide to Ideology" (Zeigler Films, 2011).

36.     A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by Plaintiff Fiennes are identified in Exhibit A-[Fiennes]. Fiennes' registered recordings include, by way of example, "Let armies loose", Registration No. PAu002889490, registered August 8, 2020.

37.     Fiennes releases music on major streaming platforms, including Spotify, Apple Music, Amazon Music, YouTube, and Pandora.

38.     Plaintiff Michael Mell, who records and produces music under the name "Mic Mell," is an Atlanta-based songwriter and producer who owns or

exercises the exclusive control over the copyrights for the sound recordings and musical-composition works (including lyrics) identified in Exhibit A-[Mell] (the "Mell Works"). Mell is the principal songwriter and recording artist for all works released as Mic Mell.

39.     Mell wrote and recorded the 12-song project "Muff-ucker" (2006) and the 13-song project "Low Blood Sugar" (2010). He has also released music as "Barcode Lounger" and "Funkanetics," including the 2006 Funkanetics single "All In A Day's Work Part I," and the 2006 Barcode Lounger album "Tech Support, Vol. 2 (Remastered) – EP." A non-exhaustive list of sound recordings and musical-composition works (including lyrics) owned or exclusively controlled by Mell are identified in Exhibit A-[Mell].

40.     Mell's projects have been published to major streaming platforms, including Spotify, Apple Music, Amazon, Pandora, and Tidal.

41.     Defendant Suno, Inc. is a Delaware corporation with its principal place of business at 17 Dunster Street, Cambridge, Massachusetts 02138.

42.     Unknown Defendants are individuals or entities who either directly infringed on Plaintiffs' federally copyrighted sound recordings or knowingly induced or materially contributed to Suno's infringement. These defendants knowingly helped, facilitated, or significantly contributed to Suno's infringement by collecting, scraping, copying, or acquiring copyrighted sound recordings for inclusion in Suno's AI training data. Additionally, these unknown defendants actively encouraged or supported Suno's infringing activities by providing vital resources, tools, or assistance and/or directly

supervised and financially benefited from Suno's unlawful conduct. Once the identities of these Unknown Defendants are discovered, Plaintiffs will amend this Complaint and serve notice on the identified persons or entities.

## JURISDICTION AND VENUE

43.     This civil action seeks damages and injunctive relief for copyright infringement under the Copyright Act, 17 U.S.C. §§ 101 et seq., removal or alteration of copyright management information under the Digital Millennium Copyright Act, 17 U.S.C. § 1202, and other claims. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this action arises under federal law. Jurisdiction can also be found under the Class Action Fairness Act, 28 U.S.C. § 1332, because (a) this is a proposed class action in which there are at least 100 Class members; (b) the parties are minimally diverse, as Plaintiffs and Defendants are domiciled in different states; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs.

44.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' and the Classes' state-law claims because they are so related to the federal claims (including the Copyright Act and DMCA claims) that they form part of the same case or controversy under Article III. The state-law claims do not raise novel or complex issues of state law, do not substantially predominate over the federal claims, and none of the circumstances enumerated in § 1367(c) applies. Exercising supplemental

jurisdiction promotes judicial economy, convenience, and fairness to the parties. Those state-law claims include, without limitation:

a. the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 et seq.;

b. the Illinois Right of Publicity Act ("IRPA"), 765 ILCS 1075/1 et seq; and

c. any other state-law claims asserted (e.g., unjust enrichment under Illinois law) arising from the same nucleus of operative facts, namely, Suno's acquisition, copying, ingestion, training, and commercialization of Plaintiffs' and Class members' recordings, lyrics, identities, and biometric identifiers/voiceprints.

45.     This Court has personal jurisdiction over Defendant Suno, Inc. ("Suno") because Suno has deliberately and continuously exploited the Illinois market and has purposefully directed suit-related conduct into Illinois and this District, and Plaintiffs' claims arise out of or relate to those Illinois contacts; exercising jurisdiction is consistent with fair play and substantial justice. Suno's Illinois- and District-related contacts include, without limitation:

(a1) Suno makes its generative AI music service and app available to users "worldwide, including every state across the country," thereby expressly including Illinois users as part of its intended customer base. Authenticated users (who have Suno's free or paid plans) in the Chicago area and in this District, for example, access Suno's service and app at https://suno.com (IPV4 addresses at 104.20.16.212 and 172.66.144.155) by

communicating directly with servers located in Chicago. There is no option to
choose servers not based in Chicago – this is selected automatically by Suno's
infrastructure architecture, routing most Illinois users to Illinois-based servers
and other infrastructure;

(a2) Suno offers its service to Illinois residents through Suno's
dedicated marketing website. Users in the Chicago area and in this District, for
example, access Suno's marketing site at https://suno.com (IPV4 addresses at
104.20.16.212 and 172.66.144.155) by communicating directly with servers
located in Chicago. There is no option to choose servers not based in Chicago –
this is selected automatically by Suno's infrastructure architecture, routing
most Illinois users to Illinois-based servers and other infrastructure;

(a3) Suno offers its service to Illinois residents through Suno's
mobile application and maintains continuous access to Illinois users through
that app. Users in the Chicago area and in this District, for example, access
Suno's service, app, and marketing site at https://suno.com (IPV4 addresses
at 104.20.16.212 and 172.66.144.155) by communicating directly with servers
located in Chicago. There is no option to choose servers not based in Chicago –
this is selected automatically by Suno's infrastructure architecture, routing
most Illinois users to Illinois-based servers and other infrastructure;

(a4) Suno expanded platform access by launching dedicated iOS
and Android mobile apps that allow users, including Illinois users, to generate
AI-created songs on consumer mobile phones and mobile devices located in
Illinois;

14

(a5) Suno intentionally broadened the distribution of its service by integrating its AI music technology into Microsoft's Copilot product, which is made available to and used by residents of Illinois, on devices located in Illinois;

(a6) Suno intentionally broadened distribution of its service through integration with Amazon's Alexa voice service, which is made available to and used by residents of Illinois on Alexa-compatible devices in Illinois (including those made by Amazon and numerous other parties under license from Amazon) and sold to as well as used by people living in Illinois;

(a7) Suno does not geoblock Illinois users and instead affirmatively invites and enables Illinois residents to create AI-generated music through its platform and integrations. Visits to Suno's website and app by residents of Illinois are tracked via browser geolocation information, including zip code, state and metropolitan area;

(a8) Suno offers tiered subscription plans (including free and paid tiers) to Illinois residents as part of its ordinary commercial operations;

(a9) Suno offers paid tiers (including "Pro" and "Premier") to Illinois residents on a recurring monthly basis, forming ongoing commercial relationships with Illinois customers;

(a10) Suno accepts and processes payment for subscriptions from Illinois users and thereby enters into repeated, ongoing commercial transactions with Illinois residents. These transactions originate from Illinois and are SSL-enctypted to ensure information is specifically targeting and safely

15

transmitting data and confirmations to and from the user's computer in
Illinois;

(a11) Suno's subscription model provides increased daily credits
and output volume for paid tiers, and Illinois subscribers purchase these tiers
to generate substantially more outputs from within Illinois;

(a12) Suno permits commercial use of AI-generated audio under its
paid tiers, including for Illinois subscribers, thereby monetizing commercial
exploitation by Illinois customers;

(a13) Suno's service performs on-demand generation "in seconds"
in response to user prompts, including prompts submitted from Illinois,
requiring continuous interactive exchanges with Suno's systems;

(a14) Suno provides tools allowing users, including Illinois users,
to customize AI outputs (including tempo, mood, instrumentation, and style),
reflecting an ongoing interactive service performed through repeated platform
interactions from Illinois;

(a15) Suno's platform includes features designed to retain users
and monetize ongoing usage (including persistent "Personas," "Covers," and
"ReMaster"), which Illinois users can create and use through repeated browser
sessions from Illinois;

(a16) Suno's platform operations necessarily involve receiving
requests (prompts, edits, regeneration commands, and other inputs)
transmitted from user devices located in Illinois to Suno-controlled endpoints,
including endpoints operated on Suno's behalf by Suno's agents like

16

Cloudflare, based in Illinois. Users in the Chicago area and in this District, for example, access Suno's service, app, and marketing site at https://suno.com (IPV4 addresses at 104.20.16.212 and 172.66.144.155) by communicating directly with servers located in Chicago. There is no option to choose servers not based in Chicago – this is selected automatically by Suno's infrastructure architecture, routing most Illinois users to Illinois-based servers and other infrastructure;

(a17) Suno's platform operations necessarily involve transmitting AI-generated music files and related outputs from Suno-controlled endpoints, including endpoints operated on Suno's behalf by Suno's agents like Cloudflare, based in Illinois, including in this District, back to devices located in Illinois, including in this District;

(a18) Suno's platform operations necessarily involve allowing Illinois users to stream and/or download generated audio into Illinois as part of the service Suno sells and performs for Illinois customers;

(a19) Suno's platform stores user accounts, settings, generation history, and libraries such that Illinois users repeatedly access their accounts and content from Illinois, reflecting a continuing course of Illinois-directed service performance;

(a20) Suno's platform and/or integrations permit users to submit prompts using voice commands (including via voice-assistant integrations), and Suno provides responses and outputs back to Illinois users as part of these interactive sessions. On information and belief, at least some voice assistant

17

integrations, like Amazon's Alexa, use AWS infrastructure in the Chicago area and in this District;

(a21) Suno encourages users, including Illinois users, to disseminate outputs on third-party platforms (e.g., YouTube, TikTok, Spotify, Instagram Reels, and SoundCloud), resulting in AI-generated outputs created on Suno's platform in Illinois being distributed into Illinois and publicly disseminated from Illinois;

(a22) Suno's business model is designed so the company profits more as users generate and commercialize additional tracks; Illinois usage and Illinois output generation directly contribute to Suno's revenue and growth;

(a23) Suno's Illinois contacts are not "random" or "fortuitous." Suno knowingly enters contractual relationships with Illinois residents under its Terms of Service and provides ongoing performance under those contracts to Illinois residents;

(a24) Suno's uniform terms reflect Suno's intent to contract with residents of every state, including Illinois, and to continuously perform paid and unpaid services for those Illinois residents;

(a25) Suno's subscription flows necessarily collect and process information sufficient to charge and renew payments, including billing information that identifies Illinois subscribers by address and/or ZIP code;

(a26) by collecting billing information and processing recurring payments, Suno knows it is doing business with Illinois residents and knowingly profits from Illinois commerce;

(a27) Suno's web and mobile services necessarily receive and process Illinois users' internet protocol (IP) addresses and related device/session data whenever Illinois users access the service, and Suno uses such data in the ordinary course for authentication, security, abuse prevention, and service operation;

(a28) Suno uses standard web and app analytics and telemetry to measure usage and performance by geography, including by state, metropolitan area, and zip code, and therefore maintains internal metrics identifying its Illinois user base and Illinois usage;

(a29) on information and belief, Suno's ordinary-course business records include state-by-state (and, where tracked, metro-area) breakdowns of accounts, paid subscribers, revenue, and usage volume, including metrics for Illinois and the Chicago area;

(a30) Suno's systems record the locations of user sessions through IP geolocation or equivalent services, and Suno uses that information to detect fraud, enforce terms, and manage abuse, thereby knowing when its platform is being used from Illinois;

(a31) Suno sends transactional communications (e.g., account confirmations, receipts, subscription renewals, password resets, and feature notices) to Illinois users as part of ongoing contractual performance and customer servicing;

19

(a32) Suno provides customer support to users in Illinois and maintains support records reflecting recurring interactions with Illinois customers;

(a33) Suno's mobile application uses push notifications and/or similar mechanisms to communicate with user devices located in Illinois, reflecting continuing Illinois-directed engagement;

(a34) Suno uses cookies and similar tracking technologies on its web interface and collects usage data from Illinois users as part of user authentication, analytics, and service operation;

(a35) Suno has publicly represented rapid and large-scale user growth, and on information and belief that user base includes a substantial number of Illinois users, given Suno's nationwide availability, nationwide marketing reach, and subscription model;

(a36) Suno's global/nationwide marketing necessarily reaches and is consumed by Illinois residents who use the service;

(a37) On information and belief, Suno commercially exploits Plaintiffs' and other Illinois residents' works and voices by using its service's ability to generate "human-like vocals," high-fidelity outputs, and recognizable stylistic features as a selling point to convert Illinois users to paid tiers and increase engagement in Illinois;

(a38) Suno's offerings include features that enable persistent vocal and style "Personas" and "Covers," and on information and belief Illinois users

use those features to generate outputs that replicate or closely simulate identifiable vocal characteristics;

(a39) Suno's service is designed to generate music that can substitute for licensed works and performances, and Suno monetizes that substitutability through subscriptions purchased by Illinois users and through the delivery of outputs into Illinois;

(a40) On information and belief, Suno has generated, delivered, and distributed into Illinois outputs that incorporate, are derived from, or are substantially similar to Plaintiffs' copyrighted musical works and sound recordings, including outputs created and consumed by Illinois users through Suno's platform;

(a41) On information and belief, Suno has generated, delivered, and distributed into Illinois voice-simulative outputs that replicate or closely simulate protected vocal identifiers of Plaintiffs and other Illinois residents, and Suno uses the availability of such outputs to market, promote, and sell its subscription service to Illinois users;

(a42) Certain Plaintiffs, as identified above, are Illinois-based artists whose works and recordings were created and recorded in Illinois, and Suno's exploitation of those works and voices is commercially felt in Illinois markets where those Plaintiffs work, perform, and license;

(a43) Suno's Illinois contacts are suit-related because Plaintiffs' claims challenge Suno's monetization and dissemination of AI outputs,

including in Illinois, built on alleged unauthorized copying/ingestion and identity/biometric exploitation;

(a44) Suno's Illinois contacts are suit-related because Suno's recurring Illinois subscription revenue is, on information and belief, driven in material part by the platform's ability to generate high-fidelity, human-like, and recognizable outputs that Plaintiffs allege infringe their works and exploit their voices and identities;

(a45) Suno's Illinois contacts are suit-related because Suno's platform encourages and facilitates downstream distribution and commercialization of AI-generated outputs by Illinois users, including dissemination from Illinois to third-party platforms, increasing Suno's revenue and market share;

(a46) Suno collected, captured, processed, stored, and commercially used biometric identifiers and biometric information of Illinois residents, including voiceprints and speaker embeddings, through its AI systems, and Suno's commercialization of its service in Illinois necessarily involves ongoing use of such biometric-derived features for generation, personalization, and output fidelity;

(a47) Suno's Illinois statutory violations are suit-related because Suno uses the ability to generate human-sounding and voice-simulative outputs to market and sell subscriptions in Illinois and to drive paid tiers used by Illinois customers;

22

(a48) Suno's Illinois statutory violations are suit-related because Suno disseminates voice-simulative outputs to and within Illinois as part of its ongoing service performance and subscription commerce with Illinois customers;

(a49) On information and belief, Suno maintains restrictions, guardrails, and moderation systems, and applies or tunes those systems in connection with user location and regulatory compliance, including for Illinois users;

(a50) on information and belief, Suno's platform records prompt strings, generation parameters, and output identifiers for user accounts, including accounts accessed from Illinois, as part of quality control, abuse prevention, and feature development;

(a51) On information and belief, Suno's systems retain generation metadata and user-history data that reflect repeated Illinois-based use and repeated delivery of outputs into Illinois;

(a52) Suno uses Cloudflare as part of its content delivery and security stack for its web and/or mobile services and based on technical testing and observation, Suno routes and serves user traffic originating from Illinois through Cloudflare points of presence and edge infrastructure located in Illinois, including in and around Chicago;

(a53) Suno's use of Illinois-based edge infrastructure facilitates the delivery of Suno's platform content and outputs into Illinois and facilitates user

23

authentication, session security, and service performance for Illinois customers;

(a54) On information and belief, Suno configures and pays for Cloudflare services (including caching, rate-limiting, bot protection, DDoS mitigation, TLS termination, and logging) that apply to Illinois user traffic and thereby constitutes deliberate operational support for Illinois service delivery;

(a55) On information and belief, Suno receives, processes, and can access logs and analytics reflecting requests served through Illinois-based Cloudflare infrastructure (including request counts, response characteristics, and geographic distributions), further reflecting Suno's knowledge of and control over Illinois service delivery;

(a56) Suno's ongoing business model includes subscription commerce, interactive service performance, and delivery and dissemination of outputs into Illinois, which are substantial and suit-related;

(a57) Illinois has a strong interest in providing a forum for redressing unlawful biometric and identity exploitation of Illinois residents (including under BIPA and IRPA) and unlawful commercialization that harms Illinois creators and Illinois commerce;

(a58) Plaintiffs, including Illinois residents and Illinois-based businesses, have a strong interest in obtaining relief in Illinois for claims that arise out of or relate to Suno's Illinois-directed subscription commerce and delivery of outputs and services into Illinois;

(a59) The burden on Suno to litigate in Illinois is not undue given Suno's intentional nationwide commerce, ongoing subscription relationships with Illinois customers, and purposeful delivery of an internet-based service into Illinois;

(a60) litigating in Illinois promotes efficient resolution because Suno's Illinois-directed conduct and Illinois statutory claims are central to the case and involve Illinois-based plaintiffs, evidence, and market impacts; and

(a61) For all these reasons, Suno could reasonably anticipate being hailed into court in Illinois for claims arising out of or relating to its Illinois-directed subscription commerce, interactive service performance, and delivery and dissemination of infringing and voice-simulative outputs into Illinois, and the exercise of specific personal jurisdiction here is consistent with due process and fair play.

46.     The Court also has supplemental jurisdiction over Suno as to the state-law claims because they arise out of a common nucleus of operative fact with the federal claims over which the Court has personal jurisdiction, and exercising supplemental jurisdiction is consistent with due process and promotes judicial economy.

47.     Venue is proper in this District as to Plaintiffs' Title 17 claims (including claims under the Copyright Act and the DMCA) pursuant to 28 U.S.C. § 1400(a), and venue is proper as to Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), because Suno is subject to personal jurisdiction in this District with respect to these claims and because a

25

substantial part of the events or omissions giving rise to these claims occurred in this District. Without limitation, and as further alleged in paragraph 45, including subparagraphs (a1) to (a61):

(a1) Plaintiffs' Title 17 claims are properly venued in this District under § 1400(a) because Suno "may be found" in this District in that Suno is amenable to specific personal jurisdiction in this District for the Title 17 claims;

(a2) Suno is "found" in this District because Suno deliberately and continuously conducts commercial activity with residents of this District through its subscription-based AI music service;

(a3) Suno is "found" in this District because Suno contracts with users in this District through its Terms of Service and subscription purchase flows;

(a4) Suno is "found" in this District because Suno accepts and processes subscription payments from users in this District and thereby engages in recurring transactions with customers in this District;

(a5) Suno is "found" in this District because Suno repeatedly performs its subscription service for users located in this District by receiving their requests and delivering outputs into this District;

(a6) Suno is "found" in this District because Suno transmits and delivers digital music outputs into this District in response to user prompts submitted from within this District;

(a7) Suno is "found" in this District because, on information and belief, Suno has generated and delivered into this District outputs that are alleged to infringe or be derived from Plaintiffs' copyrighted works and sound recordings;

(a8) The acts giving rise to Plaintiffs' Title 17 claims include Suno's distribution, delivery, and provision of allegedly infringing outputs to users located in this District;

(a9) The acts giving rise to Plaintiffs' Title 17 claims include Suno's transmission of generated outputs into this District through its website and mobile application interface;

(a10) The acts giving rise to Plaintiffs' Title 17 claims include Suno's repeated provision of access to allegedly infringing outputs to users located within this District as part of Suno's subscription service;

(a11) To the extent Suno makes AI-generated music outputs available for playback, streaming, or downloading through its platform, those acts occur in this District when Suno transmits those outputs to devices and users located in this District;

(a12) Suno's inclusion of Illinois in its intended market (worldwide) is a component of Suno's presence in this District for purposes of § 1400(a);

(a13) for claims governed by the general venue statute, venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Suno "resides" in this District within the meaning of § 1391(c)(2) and § 1391(d) in that Suno's

contacts with this District would be sufficient to subject it to personal jurisdiction in this District if this District were a separate State;

(a14) Suno "resides" in this District for purposes of § 1391(b)(1) because Suno deliberately and continuously sells subscriptions and provides ongoing service to users in this District;

(a15) Suno "resides" in this District for purposes of § 1391(b)(1) because Suno enters ongoing contractual relationships with users in this District and renews those subscription contracts on a recurring basis;

(a16) venue is also proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District;

(a17) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno's service is performed here through repeated interactive sessions initiated from this District;

(a18) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno receives prompts and other user inputs transmitted from devices located in this District;

(a19) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno generates outputs in response to prompts originating from this District and transmits those outputs into this District;

(a20) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno delivers AI-generated music files and related digital outputs into this District;

(a21) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno enables users in this District to stream, play back, and/or download and store AI-generated outputs in this District;

(a22) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno maintains user accounts and generation libraries that users in this District repeatedly access from within this District;

(a23) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno's subscription commerce includes billing, renewal, and transactional communications with users in this District (including receipts and renewal notices, on information and belief);

(a24) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because, on information and belief, Suno's platform stores and serves generation history, account metadata, and output identifiers for users who access Suno from this District;

(a25) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno's platform is designed for repeated creation and regeneration of outputs and Suno repeatedly provides those functions to users in this District;

(a26) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno's platform enables "Covers," "Personas,"

and related features that are used by users in this District and result in delivery of music and voice-simulative outputs into this District;

(a27) a substantial part of the events giving rise to Plaintiffs' BIPA-related claims occurred in this District because Suno collects, captures, processes, and commercially uses biometric identifiers and biometric information of Illinois residents, including residents of this District, through provision of its service to those residents;

(a28) a substantial part of the events giving rise to Plaintiffs' BIPA-related claims occurred in this District because Suno's alleged failures to provide required disclosures, obtain required written releases, and maintain required policies occur in connection with Suno's onboarding and provision of services to Illinois residents in this District;

(a29) a substantial part of the events giving rise to Plaintiffs' BIPA-related claims occurred in this District because Illinois residents in this District are among those whose voices and voiceprints are allegedly captured and exploited through Suno's systems;

(a30) a substantial part of the events giving rise to Plaintiffs' IRPA-related claims occurred in this District because Suno commercially exploits protected identity attributes, including distinctive voices, of Illinois residents and disseminates voice-simulative outputs to and within this District;

(a31) a substantial part of the events giving rise to Plaintiffs' IRPA-related claims occurred in this District because Suno's subscription commerce

in this District monetizes and profits from the availability and delivery of voice-simulative outputs to users in this District;

(a32) a substantial part of the events giving rise to Plaintiffs' UDTPA-related claims occurred in this District because Suno markets and sells its AI music service to consumers in this District through its website, mobile application, and related materials and transactions reaching consumers in this District;

(a33) a substantial part of the events giving rise to Plaintiffs' UDTPA-related claims occurred in this District because Suno's alleged misrepresentations, omissions, or misleading commercial practices are disseminated to and relied upon by users in this District in connection with subscription purchases and use of the service;

(a34) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Plaintiffs are Illinois-based artists and Illinois-based entities whose works and recordings were created and recorded in this District and whose commercial and reputational interests are centered here;

(a35) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because certain Plaintiffs' masters, recordings, and related business records are maintained in this District and form part of the evidence relevant to the claims;

(a36) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno's allegedly infringing and voice-simulative outputs are delivered here and affect Plaintiffs' commercial

31

opportunities in local Illinois markets where Plaintiffs perform, license, and monetize their works;

(a37) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno's platform encourages dissemination of outputs to third-party services, and outputs created by users in this District may be published and circulated from within this District, increasing the challenged distribution and market effects in this District;

(a38) a substantial part of the events giving rise to Plaintiffs' claims occurred in this District because Suno's integration with third-party platforms and devices (including voice assistants and embedded AI tools) expands the distribution of Suno's service to users in this District and results in performance and delivery of outputs into this District;

(a39) Suno uses content-delivery and security infrastructure to provide its service in this District, including infrastructure located in Illinois. For example, Suno uses Cloudflare or similar edge and security infrastructure to deliver its service, and requests from users in this District are routinely served through Chicago-area and Illinois-based points of presence;

(a40) Suno's use of Illinois-based edge infrastructure facilitates delivery of Suno's platform content and outputs into this District and constitutes part of the operational events giving rise to Plaintiffs' claims;

(a41) Suno collects and processes IP addresses and session/device metadata when users in this District access the service, and those District-

32

originated access events are part of Suno's course of conduct giving rise to Plaintiffs' claims;

(a42) Suno's ordinary-course business records and analytics include geographic breakdowns of usage and revenue, including data identifying usage and revenue from this District;

(a43) Suno's service operations include authentication, fraud prevention, and abuse prevention events that occur whenever users in this District use the service, and those operational events are part of the provision and performance of Suno's service in this District;

(a44) Suno transmits account confirmations, receipts, renewal notices, and related communications to users in this District as part of subscription performance, tracking, and customer servicing;

(a45) Suno maintains customer support channels and support records associated with users in this District, reflecting ongoing business operations and transactions in this District;

(a46) Suno's platform retains generation metadata and output identifiers associated with accounts accessed from this District, reflecting repeated output delivery and use in this District;

(a47) Suno's platform retains prompt strings, generation parameters, and related records for quality-control and abuse-prevention purposes associated with sessions originating in this District;

(a48) Venue is proper as to all claims because they arise from a common nucleus of operative facts involving Suno's unified course of

conduct—including subscription commerce, service delivery, and output distribution into this District—such that adjudicating all claims together in this District will promote efficiency and avoid fragmentation;

(a49) Illinois has a substantial local interest in adjudicating disputes involving alleged collection and commercial exploitation of Illinois residents' biometric identifiers and identity attributes under Illinois statutes, and this District is an appropriate venue for such claims because those claims are Illinois-centered by definition.

(a50) this District is an appropriate venue because Plaintiffs are located here, Plaintiffs' works and recordings were created here, and the impacts of Suno's alleged unlawful practices are materially felt here in Plaintiffs' home market, and Suno's Illinois-directed commerce is continuous and substantial.

## **FACTUAL BACKGROUND**

48.     Plaintiffs are independent artists and producers who own or exclusively control valuable copyrights and related rights in numerous sound recordings. Exhibit A, which is attached and incorporated by reference, includes a non-exhaustive sample of the copyrighted sound recordings (the "Copyrighted Recordings") that Suno has infringed. Sound recordings in Exhibit A that were registered with the U.S. Copyright Office are specifically identified.

*Suno's Launch in 2023 and Rapid Growth*

49.     In July 2023, a team of AI developers (formerly at Kensho Technologies) publicly launched Suno's "beta" version, an AI-driven music creation platform. Suno's goal was to build a product that allowed AI-generated music to compete with human-generated music.

50.     Initially operating solely through the app Discord, Suno rapidly grew its platform, enabling users to create original musical compositions in seconds from text prompts that specify genre, instrumentation, lyrics, or thematic elements.

51.     By December 2023, Suno formed a major strategic partnership with Microsoft, integrating its AI music generation technology into Microsoft's "Copilot" chatbot. This partnership greatly boosted Suno's visibility and user adoption, speeding up the commercial impact of its service. Within eight months of launching publicly, Suno gained over 10 million users, thanks to pricing tiers meant to promote widespread usage.

52.     Suno offers users an AI-powered tool that can generate digital music tracks from simple prompts. Users connect with Suno via its dedicated web interface, Microsoft's Copilot chatbot, or Amazon's Alexa+ voice service, describing desired musical features, including genre, lyrics, theme, and story elements, using text or voice commands. In seconds, Suno creates digital music files. It also provides tools for users to further customize these AI-produced tracks by adjusting tempo, mood, instrumentation, and style. However, these outputs rely entirely on Suno's unauthorized copying and use

35

of copyrighted music, significantly damaging the value and integrity of original works created by independent artists.

53.     Under the free tier, users get 50 daily credits (10 music files), while the paid Pro ($8 per month) and Premier ($24 per month) tiers offer much higher daily limits and permit commercial use of the AI-generated audio.

54.     Suno's subscription model encourages users to create and commercially use these digital music files across major content-sharing and streaming platforms, including YouTube, TikTok, Spotify, Instagram Reels, and SoundCloud. Each higher tier offers significantly more potential song credits, from 10 per day on the free plan to 2,000 per day on the Premier tier. This ensures Suno profits more as additional tracks enter the market. Suno presents itself as a smooth alternative to legal music licensing, allowing millions of "new" tracks to flood the market at minimal cost.

55.     On March 21, 2024, Suno released "v3," its self-described "first model capable of producing radio-quality music." This update greatly enhanced audio fidelity, output length, and lyrical coherence, marking a significant advancement from earlier versions.

56.     By May 30, 2024, Suno released "v3.5," which further expanded its capabilities, allowing for up to four-minute outputs in seconds and bringing Suno closer to mainstream commercial success. Public statements from Suno described v3.5 as "polished" and ready for widespread adoption in mainstream music markets.

57.     Suno's rapid growth continued with a $125 million Series B funding round in May 2024, valuing the company at around $500 million. During this time, Suno stated that it trained its models on existing copyrighted music, claiming this use was fair use. At the same time, Suno quickly expanded platform access by launching dedicated iOS and Android mobile apps, allowing millions of users to generate AI-created songs on demand across all major consumer devices.

58.     In November 2024, Suno released "v4," featuring significantly improved audio clarity, authentic vocal quality indistinguishable from human singers, and advanced AI-generated lyrics. Suno's materials stated that version 4 was specifically designed to create music tracks suitable for mainstream radio play.

59.     At the same time, Suno rolled out new features to boost monetization and retain users, such as the "Lyrics by ReMi" AI lyric assistant, the option for users to create persistent AI-generated musical "Personas," and a "ReMaster" tool that upgraded previous tracks to v4's higher audio quality.

60.     By the end of 2024, Suno's user base grew to 25 million, showing the platform's significant market impact.

61.     Suno further strengthened its commercial presence through strategic collaborations beyond Microsoft Copilot, especially partnering with Amazon to incorporate AI-generated music features into the Alexa voice assistant ecosystem. This allows users to create complete, original songs using

simple voice commands, positioning Suno at the center of mass-market consumer technology.

62. Suno's integrations with Microsoft Copilot and Amazon Alexa boost output volume and introduce AI-generated substitutes directly into consumer and commercial workflows at the point of music selection, replacing human-created, licensed sources.

63. In May 2025, Suno released "v4.5". Suno's v4.5 was designed to be a more expressive model, allegedly rendering richer, more emotive vocals, and capturing subtle sonic details like tone shifts, and layered instruments with greater fidelity. Suno added a prompt-enhancement helper that expands rough tags into detailed style guidance, and upgraded two signature tools, Covers and Personas, which can now be used together to remix voice, style, and structure in one pass. Version 4.5 was also faster compared to prior models, and can generate songs up to eight minutes in length.

64. A few weeks ago, in late September 2025, Suno released "v5". Suno says that v5 is faster (roughly ten-times quicker generation compared to prior models), with smoother transitions and more sensible verse/chorus/bridge layouts. Suno also gave creators more control. Tempo, key, dynamics, and arrangement can be fine-tuned or left to the model. Suno claims that v5 can remember vocal "characters" and instrument signatures across generations, and it adapts to a user's stylistic preferences in real time.

65.     Suno's outputs flood the market with background, incidental, and production music, reducing demand, lowering prices, and decreasing licensing opportunities for independent artists' works.

66.     Suno's commercial tiers and 'Personas' features target the same customers who would otherwise license or commission music.

67.     Despite its widespread commercial success and aggressive market stance, Suno's quick rise has come at the cost of music creators whose copyrighted works were improperly used to train Suno's AI models.

68.     Major music industry stakeholders, including Universal, Sony, Warner (through the RIAA), and the German performance rights organization GEMA, have sued Suno, alleging substantial and willful infringement through unauthorized use of their copyrighted music catalogs.

69.     Instead of stopping its infringing practices, Suno continues to claim a questionable "fair use" defense, intentionally harming rights holders and undermining established intellectual property protections meant to safeguard artists and creators.

*Suno Trains its AI Using Copyrighted Recordings*

70.     Suno's generative AI technology attempts to imitate tasks usually done by humans, especially in creating and producing music. Unlike a human musician who might listen selectively to music over a lifetime for inspiration, Suno's AI systematically copies and analyzes tens of millions of copyrighted sound recordings in their entirety. This process is fundamentally different from simple "listening," since no human could realistically listen to or fully absorb

the vast amount of music that Suno's AI processes. It involves large-scale ingestion and parameter fitting across entire recordings. After encoding the statistical patterns and expressive features in those recordings, Suno's AI synthesizes new tracks by sampling from that encoding, so the outputs remain conditioned on, and constrained by, the training corpus.

71.    Based on information and belief, Suno copied and used a significant number of the copyrighted recordings without permission. Independent artists' recordings were especially vulnerable, as many are publicly accessible online, even though they are protected by copyright. Suno's claims of creating "radio-quality music" would be impossible without directly copying, analyzing, and incorporating the expressive elements from these protected works.

72.    On information and belief, Suno (and/or its agents) bypassed encryption, paywalls, API access controls, or streaming DRM to acquire source audio and lyric text, in violation of 17 U.S.C. § 1201(a)(1); and used, offered, or procured tools primarily designed for such circumvention in violation of § 1201(a)(2) and/or § 1201(b)(1).

73.    One Suno investor openly acknowledged that the company's business plan "spawn[s] litigation" from music owners—"the risk we had to underwrite when we invested."[1] Instead of obtaining licenses or respecting

---

[1]  Brian Hiatt, A ChatGPT for Music is Here. Inside Suno, the Startup Changing Everything, Rolling Stone (Mar. 17, 2024), https://www.rollingstone.com/music/music-features/suno-ai-chatgpt-for-music-1234982307/.

attribution, Suno decided to scrape (i.e., copy/download) large amounts of copyrighted content from digital sources. This method allowed it to build a huge "training corpus" for its AI models without being limited by licensing "constraints."

74.     By way of example, Suno obtained many of the copyrighted sound recordings in its training set by illicitly downloading them from YouTube using "stream-ripping," a well-known method of music piracy.

75.     YouTube is designed for streaming, not copying. It allows users to play content as it is retrieved, but prohibits making permanent, unrestricted downloads. Plaintiffs upload certain copyrighted recordings to their official YouTube channels and conspicuously identify their protected status, including the label, copyright owner, etc.

76.     Like other streaming services, YouTube bars unauthorized copying and employs technical protections to stop it. For example, YouTube uses an evolving "rolling-cipher" system that controls access to the underlying media files and prevents direct downloads of licensed content. *See Green v. U.S. Dep't of Justice*, 111 F.4th 81, 89 (D.C. Cir. 2024) (noting streaming services encrypt media to prevent unauthorized copying).

77.     YouTube applies the rolling-cipher process with the authority of Plaintiffs as copyright owners to govern access to each sound recording Plaintiffs upload. While the rolling cipher incidentally hinders downstream copying, its primary function is to control the initial, authorized access path by which clients retrieve and assemble the expressive content. The same

41

access-gating process applies whether the user watches in real time or any client seeks to fetch the data wholesale. Access to the recording's audiovisual data requires application of that process. Requests lacking a valid, cipher-derived signature are denied; authorized playback succeeds only when the owner-approved process is executed. In practical operation, the rolling cipher controls access to the work by gating the retrieval and assembly of the audiovisual data that embodies the sound recording itself, not merely the creation of a permanent copy. The player's ability to present the recording to the user depends on successful execution of this owner-authorized process.

78.     Plaintiffs authorize YouTube to apply the rolling cipher and related time modulation protocols (TPMs) to their uploads, and to condition client access on execution of that process.

79.     Despite these protections, third-party tools exist that circumvent YouTube's rolling cipher and generate unrestricted copies of copyrighted files. This practice, commonly called "stream-ripping", has been held unlawful. *See UMG Recordings, Inc. v. Kurbanov*, 2021 WL 6492907, at 9 (E.D. Va. Dec. 16, 2021), report and recommendation adopted, 2022 WL 20417526 (E.D. Va. Feb. 10, 2022).

80.     On September 2, 2025, the International Confederation of Music Publishers (ICMP) publicly revealed evidence, including private datasets,

showing that Suno used stream-ripping to acquire copyrighted sound recordings from YouTube.[2]

81.     Suno's acquisition of Plaintiffs' Copyrighted Recordings for training was accomplished, among other ways, by unlawfully bypassing YouTube's rolling cipher and other technological measures that restrict downloading and copying of licensed content.

82.     Unknown Defendants provided a service or technology to Suno primarily designed to circumvent YouTube's rolling cipher, which effectively protects Plaintiffs' rights under §106 by preventing unauthorized reproduction, in violation of § 1201(b)(1)(A); and/or effectively controls access to the work, in violation of §1201(a)(2).

83.     By circumventing those technological measures, Suno violated the Copyright Act's anti-circumvention provisions: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A).

84.     Suno's stream-ripping and copying were unauthorized, unlawful, and integral to the creation of its models. Those violations are not excused by any later product changes or technical guardrails.

85.     Suno did not stop at stream-ripping and copying. On information and belief, Suno maintains centralized, persistent corpora of audio and lyric

---

[2] Richard Smirke, 'The Largest IP Theft in Human History': Breaking Down the Years-Long Investigation Into How AI Firms are Stealing Music, Billboard (Sept. 9, 2025), https://www.billboard.com/pro/ai-firms-steal-music-scrape-copyright-icmp-investigation/.

files, separate from transient training shards, that engineers can and do access to make additional copies for evaluation, ablation testing, alignment, red-teaming, and fine-tuning iterations. These corpora include works Suno scraped without authorization.

86.     Suno's retained corpora are used for non-training engineering workflows (e.g., test harnesses, regression suites, prompt-response evaluation, retrieval-augmented generation experiments, voice timbre matching, and guide-track alignment). Each such use reproduces and redistributes copies internally and sometimes to vendors/partners, independent of any "training" defense.

87.     On information and belief, Suno staff and contractors had search and browse access to these corpora, and Suno lacks a copy accounting or deletion protocol, resulting in unbounded downstream copying.

88.     Where Suno initially acquired recordings/lyrics from pirated/shadow-library sources or streams defeated by circumvention, those copies were retained and repurposed even when alternative sources later became available. Retention and repurposing of such pirated copies is not excused by any claim of "training" fair use.

89.     Each retention, internal replication, and reuse counts as a separate act of reproduction and, when CMI was removed, a new DMCA §1202(b) violation.

90.     On information and belief, Suno distributed copies of Plaintiffs' works (or substantial portions) by sharing corpora or sub-sets with service

providers and/or enterprise partners (including for integration, benchmarking, or fine-tuning support). Specific channels and modes of third-party dissemination, including partner integrations (Microsoft Copilot/Amazon Alexa), third-party cloud compute/storage, contractors and collaborators, multi-entity data pipelines, and off-site/disaster-recovery replication, are detailed in Count II, ¶150(a)–(e), and related allegations at ¶¶149–155.

*Suno Removes or Alters Copyright Management Information (CMI)*

91.    On information and belief, Suno's training of generative AI involves a deliberate, multi-step process designed to remove or alter copyright management information ("CMI") embedded in original recordings. This process includes acquisition, conversion to raw audio formats, standardization of audio parameters, and segmentation into anonymous snippets:

a.    *Acquisition.* Suno systematically copied tens of millions of copyrighted sound recordings from online digital sources, creating a vast dataset (or "corpus") used to train its AI models.

b.    *File conversion and metadata removal.* Suno converted the downloaded audio files, typically in MP3 or similar formats, into raw, metadata-free formats such as WAV files or audio spectrograms. This process automatically removes critical metadata, including ID3 tags, artist names, song titles, producer credits, album information, embedded artwork, licensing information, and copyright notices. As a result, the audio files become anonymized, losing their original attribution to rightful owners.

45

c. *Format standardization.* After converting recordings into anonymized formats, Suno further processes these files by standardizing their audio parameters, and re-encodes the recordings into uniform sample rates and bit depths to facilitate optimal AI training. While this additional step permanently eliminates any remaining metadata and identifiers, the underlying creative content, such as melodies, harmonies, rhythms, and vocal performances, remains fully intact, thus preserving the infringement.

d. *Disassociation via audio segmentation.* Following standardization, Suno deliberately segments the audio into short, disassociated snippets, removing any remaining context linking the segments to their original sources. On information and belief, Suno segmented the audio tracks into smaller clips, specifically designed for efficient AI "batch" processing. Segmenting tracks into short snippets removes any remaining traceable context, ensuring the original authors or performers cannot be readily identified from the resulting anonymized audio.

92. This audio-focused "strip-and-slice" pipeline is only half the story. Suno runs a similar process on the lyrics that accompany those recordings. Publicly available research papers and Suno's marketing posts reference the use of "web-scale" text datasets such as Common Crawl. Those corpora contain millions of full-text lyric files scraped from Genius, AZLyrics, Lyrics.com, and similar sites.

93. Suno pipeline converted each lyric file to raw text, stripped header metadata (song title, writer, publisher), and tokenized the text for training.

46

Each of these steps created unlawful intermediate copies of lyrical works. Suno's pipeline intentionally removes CMI, knowing that anonymized copies will be retained, reused, and distributed via outputs without attribution, inducing and concealing downstream infringement.

94.     Suno thereafter fine-tuned its v3, v3.5, v4, v4.5, v5, and other models on smaller lyric-heavy datasets to improve rhyme-scheme, syllabic cadence, and semantic-to-melody alignment—something impossible without access to protected lyric content.

95.     Suno's process intentionally ensures that original metadata, including CMI, is never preserved, restored, or otherwise maintained. This systematic removal or alteration of CMI violates 17 U.S.C. § 1202(b), as the discarded metadata explicitly informs the public, and the creators themselves, of authorship, ownership, and licensing status.

96.     Once Suno has fully anonymized and segmented the recordings, it feeds these snippets into its generative AI models, initiating the training phase.

97.     Suno trains its models with the purpose and expectation that the system will emit audio resembling recognizable works or artists without source attribution, a result enabled by its prior CMI removal.

98.     Suno further refines its models by selectively fine-tuning them on smaller, curated subsets of music data, enhancing their ability to accurately reproduce specific musical styles, characteristics, and artist signatures.

99.     Technically, Suno's models exhibit an AI phenomenon called "overfitting," occurring when an AI system memorizes specific details or

passages from its training data rather than simply learning generalized patterns. Overfitting enables the AI to reproduce segments from original recordings rather than merely generating music inspired by general musical styles. For instance, when prompted for a "Chicago blues tune," an overfitted AI may directly replicate distinctive melodic lines, or instrumental textures from specific copyrighted recordings.

100.  Suno's claim that it generates "human-sounding" or "radio-quality" music critically depends upon its unauthorized copying and exploitation of real human-created music. Indeed, one investor publicly admitted Suno needed to operate "without constraints," explicitly acknowledging the necessity of disregarding traditional licensing and attribution practices.[3]

101.  Importantly, attempts by Suno to obscure or conceal such overfitting through minor technical adjustments or "guardrails" do not negate the initial unlawful acts. The unauthorized copying of copyrighted recordings occurs at the point of ingestion into the AI training corpus. Any subsequent obfuscation of how precisely the AI reproduces original works does not cure or excuse the fundamental infringement, particularly given Suno's intentional removal of CMI to disguise the source of its data.

102.  Moreover, the consequences of overfitting include Suno's AI outputs reproducing recognizable audio signatures or audible watermarks that

---

[3]  Daniel Tencer, Suno Could Get Sued By The Record Business. Who's Backing It With $125M?, Music Business Worldwide (May 28, 2024), https://www.musicbusinessworldwide.com/suno-could-get-sued-by-the-record-business-whos-backing-it-with-125m/.

were originally embedded as CMI, such as a producer shouting "CashMoneyAP" " (compare https://suno.com/song/b13bc2e2-5468-4b5c-b17f-44d23bdf9340 and https://www.youtube.com/watch?v=Zgix4KcYqCU) or an artist vocally identifying themselves (e.g., Jason Derulo singing his own name at the start of his songs). When Suno's AI replicates these embedded identifiers in generated outputs, it does so without providing legitimate attribution to the original copyright holders or producers. This action effectively removes or distorts the intended function of these identifiers, further violating rights holders' statutory protections under § 1202(b).

103.   Suno distributes these CMI-stripped outputs to paying users "as generated tracks," knowing they will be uploaded and exploited on third-party platforms without proper attribution, further concealing infringement. These outputs trade on the commercial value of the original artists' identities, including their distinctive voices and producer tags, creating the false impression of affiliation or endorsement and appropriating persona value without consent.

104.   Suno's systematic ingestion of tens of millions of copyrighted recordings, ranging from prominent hits to independent tracks, without preserving or respecting associated metadata, constitutes numerous separate violations of § 1202(b). Given the scale of this misconduct, the resulting statutory damages are potentially enormous, reflecting the gravity of Suno's infringement and deliberate disregard for copyright law.

*Outputs Are Not Required for Liability;*
*Suno's Model Purpose and Scale Create Market Harm*
*Even Absent Plaintiff-Specific Matches*

105.   Suno's infringement completes at reproduction, when Suno copies Plaintiffs' works into its corpora and training pipelines. An AI model cannot consistently replicate distinctive elements, such as specific riffs, unique vocal stylings, or signature instrumental textures, unless those recordings were first included and memorized during its training.

106.   Public statements by Suno and investors underscore a deliberate strategy to build competitive, radio-quality substitutes "without constraints," confirming the commercial purpose and foreseeable market effects of Suno's conduct. Suno investor Antonio Rodriguez explicitly acknowledged Suno's strategy of deliberate infringement, publicly stating: "If [Suno] had deals with labels when this company got started, I probably wouldn't have invested... they needed to make this product without the constraints." [4] This admission underscores Suno's intentional disregard for standard licensing obligations, knowingly accepting infringement as part of its business model in pursuit of commercial gain.

107.   Suno's unauthorized copying has become apparent even to casual users, tech journalists, and industry experts, who regularly observe Suno's AI producing outputs similar to popular songs.[5] These widespread public

---

[4] *Id.*

[5] "Generative AI music maker startup Suno raises $125M in funding", siliconANGLE (May 21, 2024), https://siliconangle.com/2024/05/21/generative-ai-music-maker-startup-suno-raises-125m-funding/.

observations reinforce the conclusion that Suno systematically copied and ingested extensive copyrighted music into its training data without permission.

108. Despite clear evidence of infringement, Suno refuses to disclose the specific contents of its training dataset, labeling them "confidential business information." This deliberate evasiveness is intended to conceal the scale of unauthorized copying. Nevertheless, frequent outputs containing recognizable hooks, iconic vocal phrases, and signature musical elements confirm that Plaintiffs' copyrighted works were directly copied by Suno.

*Suno Cannot Claim Fair Use for Its Systemic Infringement*

109. In response to allegations of unauthorized copying, Suno has previously asserted and is expected to assert in this case that its use of copyrighted sound recordings for AI training constitutes fair use. This defense implicitly acknowledges that Suno engaged in unlicensed copying, as fair use considerations arise only when such unauthorized use has occurred.

110. Fair use does not apply to Suno's training or model operations. Suno's copying is not for indexing, search, or accessibility. It serves the same commercial purpose as Plaintiffs' works—creating, licensing, and monetizing recorded music and vocal performances. Furthermore, Suno's use does not critique or comment on Plaintiffs' works and aims to replace human-made recordings with machine-generated substitutes.

111. Suno's ingestion of entire recordings and compositions is not to help users discover Plaintiffs' works; it is to generate new outputs that compete in the same licensing and listening markets.

112. The Copyright Act, codified in 17 U.S.C. § 107, outlines four factors courts use to evaluate fair use:

a. *Purpose and character of the use.* Suno's use is commercial. It copies Plaintiffs' creative works wholesale to develop and market its AI-generated music product, directly profiting from subscriptions and usage fees. Although Suno may argue that training is transformative, a model designed to create works that compete with originals and displace them is less transformative, and factor four then predominates. Suno's product is expressly a substitute for licensed music at scale.

b. *Nature of the copyrighted work.* Plaintiffs' copyrighted recordings are quintessentially creative and artistic, falling squarely within the heartland of copyright protection. The law strongly protects expressive works, especially musical performances, against unauthorized copying and commercial exploitation.

c. *Amount and substantiality of the portion used.* Suno does not selectively or sparingly use Plaintiffs' works. Instead, Suno systematically copies complete sound recordings in their entirety, capturing their creative essence, to effectively train its AI models. Such extensive and systematic copying clearly favors Plaintiffs and strongly weighs against fair use.

d. *Effect on the market.* Suno's unlicensed copying causes cognizable market substitution and dilution in multiple, well-defined music markets, even where any given AI output is not a near-verbatim copy, because Suno's product supplies close substitutes at scale and is purposely designed and marketed to

52

replace licensed music acquisition and production. The relevant markets include, without limitation:

  i. *Sound-recording consumption & monetization.* Streaming and download markets for Plaintiffs' recordings (and long-tail catalog) are diminished as user-creators and platforms substitute Suno-generated tracks for licensed masters. Mechanisms: (A) playlist and background-music displacement; (B) "share-of-ear" substitution on UGC/social platforms; (C) algorithmic recommendation cannibalization when Suno tracks are uploaded to DSPs.

  ii. *Indie/long-tail licensing channels.* Bandcamp/Direct-to-fan sales, YouTube Content ID monetization, and micro-sync catalogs lose demand as Suno's model generates cheap substitutes targeted by genre/mood/tempo.

  iii. *Composition/publishing revenue.* Mechanical, performance, and sync royalties are diluted when Suno-generated tracks substitute for licensed usages of Plaintiffs' songs in comparable contexts (creator content, television and film scores, small-business background audio, ads), reducing PRO distributions[6] and publisher receipts.

  iv. *Commissioned works and session labor.* Commissions for custom cues, jingles, beds, and hooks are displaced by Suno prompts and in-app refinements, diminishing Plaintiffs' downstream income streams associated with their recordings and compositions.

---

[6] PRO refers to Performing Rights Organizations, which collect and distribute royalties from public performances of music, to songwriters and publishers.

v. *Lyrics-dependent markets.* Suno's ingestion and lyric-generation capabilities substitute for and dilute markets for lyric reproduction and display (e.g., lyric videos, karaoke, educational uses) and for lyric-driven synchronization, while also reducing demand for licensed derivative uses (e.g., translations, lyric excerpts in audiovisual works).

vi. *Sampling/remix/derivative markets.* Suno's outputs, engineered from Plaintiffs' copyrighted sound recordings and compositions, are used as replacements for licensed samples, stems, remixes, and "beat leases," diverting demand from Plaintiffs' authorized derivative-use markets.

vii. *Live/performance-adjacent and fan-engagement markets.* AI tracks and AI-rendered performances cannibalize demand for authorized live recordings, session work, bespoke "fan song" commissions, and other ancillary monetization tied to Plaintiffs' recordings and personas.

viii. *International sub-markets.* Low-budget global advertising, mobile gaming, and short-video platforms disproportionately substitute AI tracks for licensed independent music, compounding dilution for long-tail rights holders.

113. Suno's user scale (tens of millions), output quotas (hundreds to thousands of tracks per subscriber per month), and enterprise integrations (e.g., with conversational assistants) make substitution foreseeable and substantial. These are the kinds of market effects courts deem "the single most important element" in fair-use analysis.

114. Mechanisms of dilution and substitution (non-exhaustive examples):

a. *Scale-driven supply shock.* Suno's model and pricing tiers (including high daily output limits and "radio-quality" v3-v3.5–v4-v4.5-v5 outputs) enable industrial-scale flooding of distribution channels with AI tracks that crowd out human work in feeds, playlists, and catalog searches.

b. *Algorithmic displacement.* Recommendation, search, and playlisting systems prefer abundant, instantly-generated "good-enough" tracks, causing discoverability loss and rank demotion for Plaintiffs' works.

c. *Price suppression/anchoring.* Bundled or low-cost AI outputs reset buyer expectations, driving down sync quotes, library rates, and work-for-hire budgets; buyers substitute cheaper AI rather than licensing Plaintiffs' recordings/compositions.

d. *"Style-of" and voice-replication substitution.* Suno's features replicate signature sonic identities and voices, enabling sound-alike uses that replace the need to license Plaintiffs' actual works or hire Plaintiffs for new commissions.

e. *Derivative-market cannibalization.* Creators use Suno outputs instead of licensing samples/stems or beats from Plaintiffs, eroding revenues in those derivative markets.

f. *Platform-integration diversion.* Integration into mass-market tools (e.g., assistants, creative suites) diverts project pipelines that previously

sourced licensed music toward instantaneous AI generation, foreclosing licensing opportunities mid-workflow.

g. *Attention scarcity and catalog devaluation*. Saturation of AI tracks in the same genres/time-slots dilutes attention, lowers stream share, and devalues Plaintiffs' catalogs (including reduced royalty flows and valuation metrics).

h. *Attribution stripping and source confusion*. Removal/obfuscation of CMI and replication of audible tags (e.g., producer shouts) divert credit and reroute demand to AI substitutes by disguising provenance, aggravating displacement.

115. All four factors weigh against fair use: (1) Purpose/character: commercial and same-market substitution. (2) Nature: highly creative sound recordings and musical compositions. (3) Amount: wholesale ingestion of works during training is far beyond what is necessary for any non-substitutive purpose. (4) Market harm: Suno's uses impair Plaintiffs' licensing markets and encroach upon distinct licenses for training AI systems.

116. Suno's use of copyrighted recordings and lyrics, rather than public-domain or licensed alternatives, materially increases output quality and human-likeness, thereby increasing substitutability and magnifying market harm. If Suno trained only on non-infringing corpora, its outputs would be less substitutive and less likely to displace Plaintiffs' sales, streams, and licenses.

117. On information and belief, and subject to proof with transactional, platform, and expert data, Plaintiffs will show: (a) lost syncs and reduced sync

quotes where buyers selected Suno outputs or used "style-of" prompts to avoid licensing; (b) declines in stream share and playlist placements coincident with Suno's v3–v4 releases and creator-tool integrations; (c) reduced licensing volumes/rates in production-music, micro-sync, and beat-lease markets following Suno's scale-up; and (d) lost commissions for composition/production/session vocals where Suno outputs were used in place of hiring human creators. These forms of substitution, including indirect substitution via market dilution at scale, are harm that § 107(4) recognizes. Plaintiffs do not rely on a circular "training-license" market theory; rather, they allege concrete displacement in traditional and derivative markets that copyright protects. This factor four, therefore, weighs decisively against fair use.

118.  Given these clear facts, each fair use factor decisively weighs against Suno, and factor four is alone, dispositive. Suno's same-market design and scale dilute demand and pricing for Plaintiffs' works and licensing opportunities. Even if training carries some transformative weight, factor four controls, and fair use fails.

119.  Suno's actions cause damage far beyond immediate economic harm. Suno's systematic copying and exploitation of copyrighted recordings threaten the integrity and sustainability of the entire music ecosystem, including the livelihoods of countless musicians, composers, producers, engineers, and others who depend on a fair and functional market for music.

120.     Suno's conduct also directly undermines artists' fundamental right to control the use and presentation of their creative work, depriving them of the ability to decide how their music aligns with their aesthetic vision, personal values, and professional identity. By ignoring the need for permission or compensation, Suno spreads a dangerous misconception—that copyrighted music is free to exploit whenever technological innovation makes licensing inconvenient.

121.     Sustainable coexistence between AI and human creators can and should be achieved through established free-market licensing mechanisms that properly recognize and compensate the contributions of artists and rights holders. Unlike other AI innovators who engage responsibly through proper licensing arrangements, Suno has chosen to build its business by openly violating Plaintiffs' rights, jeopardizing both creative integrity and market stability.

122.     From its inception, Suno has deliberately disregarded the established rights of copyright holders as part of an aggressive strategy to dominate the AI music generation market. Allowing Suno or any generative AI company to succeed through deliberate infringement of copyright law threatens individual artists and the foundational legal and ethical principles that incentivize artistic creation and cultural advancement.

123.     Without judicial intervention, Suno will continue to flood the market with derivative, uncredited tracks, further impoverishing the cultural and economic landscape for independent artists. Plaintiffs, therefore, seek

damages, injunctive relief, and any other remedies that will halt Suno's unlawful acts and restore the rightful benefits of copyright protection to those who actually create the music.

## CLASS ACTION ALLEGATIONS

124.   Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all other similarly situated independent artists ("Class Members"). The term "independent artists," as used herein, broadly includes all individuals, entities, or rights holders—whether artists, musicians, songwriters, producers, estates, heirs, independent labels, or other persons—who create, perform, produce, or own exclusive rights in (a) sound recordings, and/or (b) the lyrics or other textual elements of musical compositions. Specifically excluded from this definition are the named plaintiffs in the Recording Industry Association of America's (RIAA) lawsuit against Suno (Case No. 1:24-cv-11611, U.S. District Court, District of Massachusetts) and the named plaintiffs in the lawsuit against Suno (Case No. 1:25-cv-11739, U.S. District Court, District of Massachusetts). Plaintiffs seek certification of the following nationwide classes and subclasses:

a. *Copyright Class*: All independent artists in the United States who own or exclusively control registered copyrights in sound recordings fixed on or after February 15, 1972, that appear in any dataset Suno copied, ingested, or exploited for AI training during the Class Period as alleged herein, excluding works Suno used under a written license executed by Suno during the Class Period.

b. *Previously-Unregistered Copyright Class*: All independent artists in the United States who own or exclusively control copyrights in original sound recordings that were unregistered with the U.S. Copyright Office at the time Suno copied, ingested, or exploited them for AI training during the Class Period, as alleged herein, excluding works Suno used under a written license executed by Suno during the Class Period.

c. *Lyrics Copyright Subclass*. All independent artists in the United States who own or control registered U.S. copyrights in the lyrics or textual portions of musical compositions that appear in any dataset Suno copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

d. *Previously-Unregistered-Lyrics Subclass*. All independent artists in the United States who own or control copyrights in the lyrics or textual portions of musical compositions that were unregistered with the U.S. Copyright Office at the time Suno (or its agents) copied, ingested, or used them to train, fine-tune, or reinforce-learn its music-generation models during the Class Period, as alleged herein, excluding works Suno used under a written license executed by Suno during the Class Period.

e. *Musical-Composition (Non-Lyric) Registered Subclass*: All persons or entities who, during the Class Period, owned U.S. registered copyrights in the non-lyric musical-composition elements (melodic, harmonic, rhythmic expression and fixed arrangements) of works that appear in any dataset Suno

60

copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

f. *Musical-Composition (Non-Lyric) Previously-Unregistered Subclass*: All persons or entities who, during the Class Period, owned musical compositions (non-lyric, including melodic, harmonic, rhythmic expression and fixed arrangements) that were unregistered with the U.S. Copyright Office at the time Suno (or its agents) copied, ingested, or used them to train, fine-tune, or reinforce-learn its music-generation models, as alleged herein, excluding works Suno used under a written license executed by Suno during the Class Period.

g. *DMCA Subclass*: All independent artists in the United States whose copyrighted sound recordings and/or musical-composition materials contained Copyright Management Information (CMI) at or before Suno's acquisition, copying, conversion, segmentation, ingestion, training, fine-tuning, or evaluation, and that Suno acquired, copied, converted, processed, or ingested during the Class Period; excluding works Suno used pursuant to a written license executed by Suno during the Class Period.

h. *§ 1201 Anti-Circumvention Subclass*: All independent artists in the United States who own or control copyrights in sound recordings and/or lyrics that, at the time Suno or its agents acquired or accessed them, were made available through platforms, services, or delivery mechanisms employing technological measures that effectively control access to, or protect rights in, the works (e.g., YouTube's rolling cipher, HTTPS tokening/HLS AES-128

61

session keying, or DRM such as Widevine/PlayReady/FairPlay), and that Suno or its agents acquired, accessed, copied, converted, processed, or ingested during the Class Period; excluding works Suno used pursuant to a written license executed by Suno during the Class Period.

      i.   *Illinois Biometric Information Privacy Act Subclass*: All independent artists residing in Illinois who created or performed sound recordings containing distinctive voiceprints or vocal identifiers, which Suno collected, captured, stored, or used without obtaining informed written consent as required under Illinois BIPA (740 ILCS § 14/1, et seq.). This subclass consists of natural persons.

      j.   *Illinois Right of Publicity Subclass*: All independent artists who are Illinois residents and/or whose identities (including name, voice, signature, photograph, image, or likeness) were used by Suno for a "commercial purpose" in Illinois, without prior written consent, by: (i) reproducing, synthesizing, or simulating their distinctive voices or vocal signatures in Suno-generated outputs; and/or (ii) using their names, voices, or other identifying attributes to advertise, market, or promote Suno's products or services. This subclass consists of natural persons.

      k.   *Illinois UDTPA Subclass (Injunctive Relief Only)*: All Illinois-resident members of any subclass seeking injunctive relief under 815 ILCS 510/3.

      l.   *Illinois Unjust Enrichment Subclass*: All Illinois-resident owners of relevant rights whose works, likenesses, or voiceprints appear in any dataset

Suno copied, ingested, or used to train, fine-tune, or reinforce-learn its music-generation models during the Class Period.

m. Excluded from these classes are Suno, its affiliates, subsidiaries, officers, directors, employees, counsel, immediate family members of such persons, the named plaintiffs in the Recording Industry Association of America's (RIAA) lawsuit against Suno (Case No. 1:24-cv-11611, U.S. District Court, District of Massachusetts), the named plaintiffs in the lawsuit against Suno (Case No. 1:25-cv-11739, U.S. District Court, District of Massachusetts), and the presiding judge and court personnel involved in this action.

n. As used above, 'Class Period' means the maximum time span permitted under the applicable statutes of limitations, accrual principles, and tolling doctrines for the claims asserted—including, as applicable, the discovery rule, the separate-accrual doctrine for continuing infringements, continuing-violation concepts, fraudulent concealment, and equitable tolling—measured back from the filing of this action through the date of judgment (or class notice), without waiver of any longer period permitted by law.

o. For avoidance of doubt, nothing in any class or subclass definition limits, waives, or disclaims claims or remedies available under statutes other than the Copyright Act, including without limitation the DMCA, BIPA, IRPA, and UDTPA, and any reference to registration status, statutory damages, or attorneys' fees applies only to Copyright Act claims.

125. *Ascertainability*: Class members can be readily ascertained from public copyright registries, Suno's records, digital identifiers, and other reliable

public and private records. Additionally, widely available and reliable digital fingerprinting technologies, such as audio content identification systems, can efficiently identify class members' infringed recordings, making class administration manageable.

126.   *Numerosity Rule 23(a)(1))*: The proposed classes consist of thousands of independent artists nationwide, including a significant number within Illinois, making the joinder of all members impracticable.

127.   *Commonality (Rule 23(a)(2))*: Numerous questions of law and fact are common to all class members, and these common questions generate common answers resolving central issues for the entire class. These include, but are not limited to:

a.   Whether Suno systematically acquired, copied, ingested, and used class members' copyrighted sound recordings and/or lyrics in its training and model-operation pipelines;

b.   Whether Suno's copying, retention, and use of complete works during ingestion, training, and fine-tuning infringes the reproduction right under 17 U.S.C. § 106(1);

c.   Whether Suno's fair-use defense applies to the alleged training and model-operation conduct under 17 U.S.C. § 107;

d.   Whether Suno removed or altered Copyright Management Information (CMI) from class members' recordings and/or lyrics with the requisite knowledge or reason to know under 17 U.S.C. § 1202(b);

e. Whether Suno collected, stored, and commercially exploited class members' biometric identifiers (voiceprints) without obtaining informed consent under Illinois BIPA.

f. Whether Suno acted willfully, intentionally, or recklessly with respect to the challenged conduct;

g. Whether class-wide injunctive relief is appropriate to stop ongoing copying/ingestion, CMI removal/alteration, circumvention/trafficking, and unlawful use of biometric identifiers;

h. Whether Suno's unauthorized ingestion and storage of entire works violates § 106(1) even absent evidence of public-facing outputs;

i. Whether Suno's dissemination of datasets or copies to vendors, partners, or collaborators constitutes distribution "to the public" under § 106(3) or, in the alternative, supports reproduction liability; and whether "making available" suffices to plead or prove distribution;

j. Whether YouTube's rolling cipher, HTTPS tokening/HLS session keying, and DRM systems (e.g., Widevine/PlayReady/FairPlay) are "technological measures" that effectively control access to, or protect rights in, the works within the meaning of 17 U.S.C. § 1201, and whether any asserted fair-use defense applies to § 1201 claims;

k. Whether Suno provided or distributed false CMI in connection with outputs within the meaning of 17 U.S.C. § 1202(a) and with the requisite intent;

l.   Whether Suno collected, captured, or obtained Illinois residents' voiceprints, without required policy, notice, and consent BIPA requires; whether violations accrue per-scan; and the applicable limitations period.

m. Whether Suno used Illinois residents' voices/identities for commercial purpose without consent within the meaning of IRPA, and whether IRPA claims are not preempted by the Copyright Act.

n. Whether Suno's marketing/positioning is likely to cause confusion or misunderstanding as to source, sponsorship, approval, or affiliation under the Illinois UDTPA (injunctive relief).

o.  Whether Suno qualifies (or does not qualify) for DMCA § 512 safe-harbor protections for the conduct alleged;

128.   *Typicality (Rule 23(a)(3))*: Plaintiffs' claims are typical of class members' claims. Plaintiffs and class members suffered identical harms from Suno's unauthorized and systematic copying, ingestion, and commercial exploitation. All claims arise directly from Suno's uniform, unlawful conduct.

129.   *Adequacy of Representation (Rule 23(a)(4))*: Plaintiffs are independent artists whose interests are fully aligned with, and not antagonistic to, class members' interests. Plaintiffs retained experienced counsel skilled in complex copyright, DMCA, biometric privacy, and class action litigation. Plaintiffs and counsel will vigorously prosecute this action and adequately represent class interests.

130.   *Predominance and Superiority (Rule 23(b)(3))*: Common questions predominate over individual questions. Class-wide adjudication is efficient, fair,

economical, and superior to individual litigation, which would be impractical, economically prohibitive, and risk inconsistent rulings. Class-wide adjudication is particularly appropriate because Suno's unauthorized copying and ingestion processes are automated, systematic, and identical across all class members, making individual factual inquiries unnecessary and impractical.

131.   Statutory and other damages, although significant in aggregate, may individually be insufficient to justify costs associated with individual lawsuits, making class adjudication clearly superior.

132.   *Injunctive Relief (Rule 23(b)(2))*: Suno acted on grounds applicable to the entire class, making injunctive and declaratory relief appropriate for the classes as a whole. Absent class-wide injunctive relief, Suno's unlawful conduct will continue, causing irreparable harm to Plaintiffs and all class members.

## CLAIMS FOR RELIEF

### Count I

### Direct Copyright Infringement,
### 17 U.S.C. § 101 et seq.

*Brought on behalf of the Copyright Class members*

133.   Plaintiffs reallege and incorporate by reference the allegations contained in all preceding paragraphs as though fully set forth here.

134.   Plaintiffs Woulard, ATS, and the Burjek Plaintiffs bring this claim individually and on behalf of all other Copyright Class members, for unauthorized reproduction, based on Suno's copying, storage, and use of entire works during pre-training, training, and fine-tuning.

135.   Plaintiffs Woulard, ATS, and the Burjek Plaintiffs are the sole owners, co-owners, or exercise the exclusive control over the valid and enforceable copyrights in the sound recordings identified in this complaint (the "Copyrighted Recordings"). These Copyrighted Recordings are original, creative, fixed in tangible form, and properly registered with the U.S. Copyright Office.

136.   Under 17 U.S.C. § 106, Plaintiffs and class members have the exclusive rights to reproduce, distribute, publicly perform, publicly display, and create derivative works based upon their Copyrighted Recordings.

137.   Without authorization, Suno intentionally and systematically copied, ingested, and used these Copyrighted Recordings as part of its AI model training, and commercially exploited derivative outputs derived therefrom.

138.   Suno's infringement extends beyond initial reproduction to retention, internal redistribution, and repeated re-use of Plaintiffs' Copyrighted Recordings in centralized corpora for engineering/non-training workflows. These ongoing reproductions are independent infringements.

139.   Suno's commercial deployment of models built from those unlawful copies predictably substitutes for licensed uses across recognized markets, causing cognizable market harm even apart from any specific output match.

140.   Independent of training, based on information and belief, Suno acquired, standardized, indexed, and retains full-fidelity copies of Plaintiffs' recordings (and lyrics) from unauthorized online sources, organized into an internal central library used for reference, evaluation, model-comparison, and

68

post-training features (including remastering and style calibration), uses not necessary for model training. This pirated-library copying is not fair use.

141.   Suno's infringement extends further, producing and distributing derivative AI-generated music directly derived from Plaintiffs' Copyrighted Recordings. These unauthorized derivative works compete with Plaintiffs' original recordings, undermining their commercial value and disrupting crucial licensing opportunities—opportunities that are particularly essential for independent artists.

142.   Suno's infringement is deliberate and intentional. Suno and its investors openly admitted their intent to bypass licensing obligations, explicitly adopting a business strategy premised on intentional copyright infringement.

143.   As a direct and proximate result of Suno's ongoing infringement, Plaintiffs, especially independent artists, suffer substantial and irreparable harm, including lost licensing revenues, diminished market opportunities, damage to their professional reputations, and loss of critical control over their creative works.

144.   Suno's infringement has been and continues to be willful and intentional, demonstrating reckless disregard for Plaintiffs' exclusive rights. Suno was aware, or should have been aware, that its copying, ingestion, and use of the Copyrighted Recordings violated established copyright laws.

145.   Unless enjoined by this Court, Suno's infringement will continue unabated, causing irreparable harm to Plaintiffs' economic and creative interests. Monetary damages alone are insufficient to fully redress the harm

caused by Suno's ongoing infringement, necessitating injunctive relief to prevent continued violations.

146.   Plaintiffs seek relief, including statutory damages (or alternatively actual damages and profits attributable to the infringement), attorneys' fees and costs, and injunctive relief pursuant to 17 U.S.C. §§ 502, 504, and 505.

**Count II**

**Direct Copyright Infringement (Distribution of Copyrighted Recordings, 17 U.S.C. §106(3))**

*Brought on behalf of the Copyright Class members*

147.   Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–132 as though fully set forth here.

148.   Plaintiffs Woulard, ATS, and the Burjek Plaintiffs and the Copyright Class own or exercise the exclusive control over the Copyrighted Recordings. Under 17 U.S.C. § 106(3), Plaintiffs have the exclusive right to distribute copies or phonorecords of their works to the public by sale or other transfer of ownership, or by rental, lease, or lending.

149.   In addition to, and independent of, Suno's unauthorized reproduction of Plaintiffs' Copyrighted Recordings (Count I), Suno distributed or caused to be distributed unauthorized copies of those works to third parties and the public, including by electronic transmission and remote provisioning that placed copies in the possession, custody, or control of non-Suno entities. Suno's infringement began with the unauthorized reproduction of Plaintiffs'

and class members' Copyrighted Recordings during AI training and continues through retention, internal replication, and engineering re-use

150. On information and belief, without authorization, Suno transmitted, uploaded, provided, or otherwise made available copies of Plaintiffs' Copyrighted Recordings, and datasets and corpora containing them, to third parties in at least the following ways (each an act of distribution under § 106(3)):

    a. *Third-party platform integrations.* In connection with Suno's commercial integrations with Microsoft Copilot and Amazon Alexa, Suno transmitted, provisioned, or otherwise caused copies of training and/or evaluation datasets containing Registered Copyrighted Recordings to be accessible within those partners' environments and pipelines, or to be received and held by their personnel, systems, or managed infrastructure for integration, validation, and deployment purposes.

    b. *External compute/storage vendors.* Suno transmitted and stored copies of Copyrighted Recordings with third-party cloud compute and storage providers (including hyperscale vendors) for training, fine-tuning, evaluation, staging, backup, and disaster-recovery workflows, thereby delivering copies to entities outside Suno for their operation and maintenance in the ordinary course of those services.

    c. *Contractors, vendors, and collaborators.* Suno distributed copies to outside contractors, data labeling/evaluation vendors, research collaborators, and other Unknown Defendants who "compiled, scraped, [or] obtained

71

copyrighted sound recordings for inclusion in Suno's AI training data," including to facilitate preprocessing, curation, quality control, and model-evaluation tasks.

d. *Multi-entity data pipelines.* Suno seeded or replicated Copyrighted Recordings into shared, multi-entity data pipelines (e.g., external object stores, artifact registries, code/data repositories, or model-ops systems) accessible to non-Suno personnel, enabling those third parties to download, cache, shard, batch, or otherwise hold copies.

e. *Off-site replication and disaster recovery.* Suno caused additional distributions by replicating Copyrighted Recordings to off-site backup/disaster-recovery systems operated by third parties, including geo-replication that created and maintained additional copies in non-Suno facilities.

151. Each electronic transmission, upload, replication, provisioning, or third-party access enablement identified above constitutes a distinct distribution of Plaintiffs' Copyrighted Recordings "to the public" under § 106(3), regardless of whether Suno labeled such transfers as temporary, intermediate, encrypted, or for "testing," and regardless of subsequent deletion. For avoidance of doubt, "to the public" includes making copies available to multiple independent third parties—such as partners, vendors, contractors, or collaborators—whether by transmission, remote provisioning, or placement into multi-entity data stores, notwithstanding labels like "temporary," "encrypted," or "testing."

152.   These distributions were commercial and willful, undertaken to accelerate product integrations (e.g., Microsoft Copilot, Amazon Alexa), scale Suno's subscription platform, and secure competitive advantage and investment.

153.   Plaintiffs allege distribution on information and belief where the specific recipients, transfer mechanisms, and volumes are peculiarly within Suno's possession and those of its partners.

154.   In the alternative, even if Suno's dataset transfers were not 'to the public,' each transfer created at least one unauthorized reproduction (server-side copy, cache, shard, checkpoint), independently violating §106(1).

155.   Reproduction and distribution are pleaded independently. Suno's § 106(3) distribution infringements are pleaded as separate and additional to Suno's § 106(1) reproduction infringements; distribution is not subsumed by reproduction in this Complaint.

156.   Plaintiffs seek the same forms of relief as in Count I for each act of distribution, including statutory damages (or, in the alternative, actual damages and profits), attorneys' fees and costs, and injunctive relief.

### Count III

### Direct Copyright Infringement of Unregistered Recordings, 17 U.S.C. §101 et seq.

*Brought on behalf of the Previously-Unregistered Copyright Class Members*

157.   Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–132 as though fully set forth here.

158.   Plaintiffs bring this claim individually and on behalf of the Previously Unregistered Copyright Class members, for unauthorized reproduction, based on Suno's copying, storage, and use of entire works during pre-training, training, and fine-tuning.

159.   Plaintiffs and Subclass members own previously unregistered sound-recording copyrights ("Previously Unregistered Copyrighted Recordings") that Suno copied, ingested, trained on, and exploited. These recordings are original, creative, fixed in tangible form, and protected under 17 U.S.C. § 102(a) upon creation and fixation.

160.   Plaintiffs and class members possess exclusive rights under 17 U.S.C. § 106 to reproduce, distribute, publicly perform, publicly display, and create derivative works from their Previously Unregistered Copyrighted Recordings.

161.   Without Plaintiffs' or class members' authorization, Suno intentionally and systematically copied, ingested, reproduced, distributed, and commercially exploited these Previously Unregistered Copyrighted Recordings by incorporating them into Suno's generative AI platform.

162.   Suno's infringement began at the point of unauthorized copying of Plaintiffs' and class members' Previously Unregistered Copyrighted Recordings during AI training and continued with each subsequent AI-generated derivative work commercially exploited by Suno.

163.   Independent of training, based on information and belief, Suno acquired, standardized, indexed, and retains full-fidelity copies of Plaintiffs'

recordings (and lyrics) from unauthorized online sources, organized into an internal central library used for reference, evaluation, model-comparison, and post-training features (including remastering and style calibration), uses not necessary for model training. This pirated-library copying is not fair use.

164. Suno's unauthorized use has harmed, and continues to irreparably harm, Plaintiffs and the class by undermining licensing opportunities, diminishing the economic value of original recordings, and impairing their professional reputations.

165. Plaintiffs and the class are entitled to injunctive and declaratory relief, disgorgement of Suno's profits attributable to infringement, and actual damages incurred, pursuant to 17 U.S.C. §§ 502 and 504(b). For any work encompassed by this Count that was unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be deemed supplemented to include the relevant registration(s).

166. Plaintiffs expressly do not seek statutory damages or attorneys' fees under this count due to the unregistered status of these copyrights.

**Count IV**

**Direct Copyright Infringement of Musical-Composition Lyrics,
17 U.S.C. §101 et seq.**

*Brought on behalf of the Lyrics Copyright Subclass
and Previously-Unregistered-Lyrics Subclass*

167.   Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–132 as though fully set forth here.

168.   Plaintiffs Woulard, ATS, and the Burjek Plaintiffs are the owners of valid and enforceable copyrights in the lyric compositions listed in Exhibit A (the "Copyrighted Lyrics"). Each is an original literary work fixed in a tangible medium and properly registered with the U.S. Copyright Office.

169.   Under 17 U.S.C. § 106, Plaintiffs and class members hold the exclusive rights to reproduce, distribute, publicly perform, publicly display, and create derivative works based on their Copyrighted Lyrics.

170.   Without permission, Suno intentionally and systematically copied, ingested, and stored the Copyrighted Lyrics, either in whole or substantial part, as training data (and subsequent fine-tuning data) for its music-generation models.

171.   The first act of infringement occurred the moment Suno reproduced Plaintiffs' Copyrighted Lyrics in its training datasets. Every subsequent round of model training, updating, or fine-tuning that relied on those copies constitutes a separate, independently actionable infringement.

172.   Suno's models routinely generate new lyric outputs—sometimes verbatim, sometimes with minimal cosmetic changes, other times echoing

distinctive phrasing, rhyme schemes, hooks, or narrative structures— that are derivative of Plaintiffs' Copyrighted Lyrics. These outputs are offered to paying users and compete directly with the original works in licensing, synchronization, streaming, and live-performance markets.

173.   Suno's founders and investors have publicly acknowledged that they launched the product "without licensing constraints," accepting the risk that unlicensed lyrics would drive model quality and market share.

174.   As a direct and proximate result of Suno's lyric-level infringement, Plaintiffs have suffered (and will continue to suffer) lost mechanical and synchronization fees, diminished publishing revenues, dilution of the market value of their catalogs, and loss of artistic control over how and where their lyrics appear.

175.   Suno's conduct is willful and in reckless disregard of Plaintiffs' rights. Suno knew, or consciously avoided knowing, that copying entire lyric databases without a license violates the Copyright Act and standard music-publishing practices.

176.   Unless enjoined, Suno will continue to copy, retain, and exploit Plaintiffs' Copyrighted Lyrics, causing irreparable harm that monetary damages alone cannot remedy.

177.   Plaintiffs who own unregistered lyric copyrights seek only actual damages, Suno's profits attributable to the infringement, and injunctive relief under 17 U.S.C. § 504(b); they do not seek statutory damages or attorneys' fees for those unregistered works. For any lyrics encompassed by this paragraph

that were unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s).

### Count V

### Direct Copyright Infringement of Musical-Composition Expression (Non-Lyric), 17 U.S.C. § 101 et seq.

*Brought on behalf of the Musical-Composition (Non-Lyric) Registered and Previously-Unregistered Subclasses.*

178.   Plaintiffs reallege and incorporate by reference the allegations in ¶¶1–132 as though fully set forth here.

179.   Plaintiffs (and/or their music-publishing affiliates or exclusive licensees) own valid, enforceable copyrights in musical compositions independent of lyrics, including protectable melodic, harmonic, and rhythmic expression and fixed arrangements, identified in Exhibit A (the "Copyrighted Musical Compositions (Non-Lyric)"). Each work listed in Exhibit A is an original work of authorship fixed in a tangible medium; where noted, the work is registered with the U.S. Copyright Office with an effective date of registration before the infringements alleged herein.

180.   Under 17 U.S.C. § 106, Plaintiffs hold the exclusive rights to reproduce and distribute the Copyrighted Musical Compositions (Non-Lyric),

and to prepare derivative works (including but not limited to musical arrangements and orchestrations).

181. Without authorization, Suno intentionally and systematically copied and reproduced the Copyrighted Musical Compositions (Non-Lyric) as part of its training/fine-tuning pipeline. On information and belief, Suno: (i) ingested full-length sound recordings embodying Plaintiffs' compositions; (ii) performed audio-to-symbolic and audio-to-feature transformations to extract or infer melodic pitch-time sequences, chord progressions, harmonic rhythm/voice-leading, meter/tempo maps, groove patterns, arrangement/stem structure, and timbral/orchestration features; and (iii) fixed those representations in intermediate files, token sequences, spectrograms, embeddings, and model parameters retained for extended durations across training runs and model versions. Each such fixation constitutes an unauthorized reproduction under § 106(1).

182. The foregoing reproductions include complete or substantially complete non-lyric musical expression from Plaintiffs' compositions (e.g., distinctive motifs, hooks, chord-progression-plus-groove combinations, arrangement choices, and orchestration patterns), captured through Suno's batch processing, segmentation, and tokenization workflow alleged in the current complaint.

183. Plaintiffs' claims in this Count do not depend on current proof of public-facing outputs. Liability arises from unauthorized reproduction during ingestion, training and storage of Plaintiffs' musical-composition expression.

184. In the alternative, to the extent Suno's service outputs reproduce or are substantially similar to distinctive melodic/rhythmic motifs, hooks, chord-progression-plus-groove combinations, signature arrangement/orchestration choices, or other non-lyric expressive elements from Plaintiffs' compositions, such outputs constitute unauthorized derivative works under § 106(2) that compete in synchronization, production/library, performance, and other licensing markets.

185. On information and belief, Suno distributed or caused to be distributed copies or material portions/representations of Plaintiffs' non-lyric musical-composition expression (including datasets, feature matrices, token sequences, embeddings, and/or model checkpoints containing memorized composition content) to third-party vendors and infrastructure providers, and/or to collaborators and integration partners during development, testing, and deployment, each instance an additional violation of § 106(3).

186. Suno's infringement was willful. Suno and its investors publicly acknowledged launching and scaling "without licensing constraints," accepting litigation risk rather than seeking permission, thereby demonstrating knowledge of and reckless disregard for Plaintiffs' exclusive rights.

187. As a direct and proximate result of Suno's unauthorized reproductions (and, in the alternative, derivative outputs), Plaintiffs suffered and will continue to suffer harm, including loss of licensing revenues (e.g., composition dataset/training licenses, synchronization/production/library, performance, and arrangement-use fees), market dilution and substitution in

80

music-for-media and production/library markets, and loss of control over the integrity and presentation of their musical works.

188.  For composition works in Exhibit A that are registered prior to infringement and those registered by members of the class prior to infringement, Plaintiffs seek statutory damages and attorneys' fees under 17 U.S.C. § 504(c) and § 505.

189.  For composition works in Exhibit A that are unregistered and those that were unregistered by members of the class prior to infringement, Plaintiffs seek injunctive relief, actual damages, and disgorgement of Suno's profits attributable to the infringement under § 504(b), and will seek to amend to add statutory damages and fees for any such works that become registered consistent with 17 U.S.C. § 412. For any musical composition encompassed by this paragraph that was unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act for any such composition unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s).

190.  Monetary relief alone cannot redress Suno's ongoing reproduction of Plaintiffs' musical-composition expression in training corpora, intermediate representations, and model parameters. Plaintiffs therefore seek a permanent injunction prohibiting Suno from further copying, storing, using, or distributing Plaintiffs' non-lyric composition content (including associated

features/embeddings/parameters), and requiring deletion/purge of all copies and derivatives containing Plaintiffs' composition material from Suno's systems, vendors, and collaborators.

191. Plaintiffs incorporate by reference their DMCA § 1202 allegations regarding removal/alteration of CMI to the extent Suno stripped composer/publisher identifiers from composition sources used to build lyric-independent composition datasets or feature sets; and Plaintiffs' BIPA allegations to the extent Suno's training captures and reproduces distinctive vocal style elements inseparable from composition arrangements.

## Count VI

### Removal or Alteration of Copyright Management Information, 17 U.S.C. §1202(b)

*Brought on behalf of DMCA Subclass, Lyrics Copyright Subclass, Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered and Previously Unregistered Subclasses*

192. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-132 as though fully set forth here.

193. Plaintiffs, including the DMCA Subclass, Lyrics Copyright Subclass, Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered and Previously-Unregistered Subclasses, bring this claim under 17 U.S.C. § 1202(b).

194. Suno intentionally removed and/or altered CMI embedded in both (i) sound-recording files and (ii) lyric-text files during the copying, conversion, and segmentation of those works for AI training. The stripped-or-modified CMI includes, by way of example, song titles, songwriter and performer names,

publishers, ISRC and ISWC codes, embedded watermarks, and copyright notices, all of which identify rightful ownership and licensing terms.

195.    Plaintiffs' Copyrighted Recordings include embedded CMI, such as artist names, track titles, album details, producer and engineer credits, copyright notices, licensing restrictions, and unique identifying information, in metadata formats such as ID3 tags, embedded watermarks, and other audio file headers.

196.    This embedded CMI plays a critical role in identifying Plaintiffs' works, safeguarding ownership, enabling proper licensing, and protecting their economic and creative rights in the music marketplace.

197.    On information and belief, Suno intentionally and systematically removed, altered, or obscured Plaintiffs' CMI from sound recordings when Suno copied, converted, standardized, segmented, and ingested these recordings into its AI training datasets. Such removal and alteration stripped Plaintiffs' recordings of essential identifying information, severing critical attribution to Plaintiffs.

198.    Suno knew or had reason to know that removing or altering Plaintiffs' CMI would facilitate or conceal its unauthorized copying and infringement. Given the vast scale, sophisticated methods, and intentional nature of Suno's conduct, Suno's removal and alteration of CMI was deliberate, willful, and purposeful.

199.    Suno further disseminates outputs from its generative AI that frequently contain identifiable audio signatures originally embedded as CMI,

such as producer tags or distinct artist identifiers, but stripped of their original context or attribution. This intentional misappropriation causes confusion regarding the true source and ownership of the resulting AI-generated works and obscures the underlying infringement of Plaintiffs' rights.

200.   Each individual removal, alteration, or distribution of Plaintiffs' recordings stripped of CMI constitutes a separate violation of 17 U.S.C. § 1202(b). Given Suno's ingestion and alteration of tens of millions of recordings, including substantial numbers of Plaintiffs' works, the scope and volume of violations are immense.

201.   Suno is not entitled to any of the safe harbor protections under 17 U.S.C. §512. Unlike passive service providers, Suno actively and intentionally copied, ingested, and manipulated Plaintiffs' sound recordings and associated CMI. Suno's AI platform is not a passive conduit or hosting service. It's a sophisticated, active commercial system designed to copy, alter, and distribute copyrighted works without authorization or attribution. As such, Suno cannot credibly claim the protection of the safe harbors provided by Section 512.

202.   Plaintiffs have suffered, and continue to suffer, substantial and irreparable harm from Suno's deliberate removal and alteration of CMI. This harm includes significant loss of licensing opportunities, reduced market value of Plaintiffs' works, diminished control over their creative output, and harm to Plaintiffs' professional reputations and standing in the marketplace.

203.   Unless restrained by the Court, Suno's unlawful conduct will continue, causing Plaintiffs ongoing irreparable harm for which monetary

damages alone are inadequate. Immediate and permanent injunctive relief is therefore necessary to halt Suno's ongoing violations.

204.  Plaintiffs seek relief under 17 U.S.C. §§ 1203 and 1202(b), including statutory damages for each separate act of CMI removal or alteration, attorneys' fees, litigation costs, and injunctive relief sufficient to fully address and halt Suno's unlawful practices.

**Count VII**

**Circumvention of Access Controls, DMCA § 1201**

*Brought on behalf of the § 1201 Anti-Circumvention Subclass*

205.  Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-132 as though fully set forth here.

206.  The Digital Millennium Copyright Act prohibits (i) circumvention of a technological measure that effectively controls access to a copyrighted work, 17 U.S.C. § 1201(a)(1); (ii) manufacturing, importing, providing, or otherwise trafficking in technology, products, services, devices, or components that are designed for, have limited commercially significant purpose other than, or are marketed for circumventing access controls, § 1201(a)(2); and (iii) trafficking in technology, products, services, devices, or components that are designed for, have limited commercially significant purpose other than, or are marketed for circumventing copy-control measures that protect rights under Title 17, § 1201(b)(1).

207.  On information and belief, during the Class Period Suno and/or its data vendors and agents acquired vast volumes of commercially released

85

recordings by bypassing or defeating stream-protection and download-prevention technologies widely deployed by rightsholders and licensed platforms, including but not limited to cryptographic signature schemes and rolling ciphers used to prevent direct downloads (e.g., YouTube's rolling cipher), HTTPS tokening/HLS AES-128 session keying, and digital rights management systems such as Widevine, PlayReady, and FairPlay, which are technological measures that, in the ordinary course of their operation, require the application of information, processes, or treatments authorized by the copyright owner to gain access to the underlying audio files. For example, Suno avoided, bypassed, removed, deactivated, and/or impaired YouTube's rolling cipher by running signature-decoding routines and other code to generate unauthorized requests to the protected media endpoints.

208.   On information and belief, Suno circumvented these technological measures, without the authority of copyright owners, by "avoid[ing], bypass[ing], remov[ing], deactivat[ing], or impair[ing]" them to obtain decrypted or otherwise unprotected copies for ingestion and training, including by deploying or procuring automated ripping/scraping utilities and decryption routines capable of resolving platform ciphers, session keys, or DRM to extract raw audio. 17 U.S.C. § 1201(a)(3)(A). For example, the authorized YouTube player computes an ephemeral, cipher-derived signature for each request to the media endpoints (including segmented streams). Without that computation, the content data is not returned. Suno's stream-ripping code reproduced this computation outside the authorized player to obtain the protected data. Suno's

own pipeline then converted the resulting files to raw, metadata-free formats for storage and batch, confirming the end-to-end purpose of obtaining unprotected access at scale.

209.   On information and belief, Suno manufactured, adapted, integrated, and/or procured technologies, products, services, devices, or components (including custom scripts, modules, and ingest services) that are primarily designed for circumvention of platform access controls and/or copy controls; that have no or only limited commercially significant purpose other than circumvention; and/or that were provided, supplied, or used by Suno and its data vendors for circumvention, all in violation of §§ 1201(a)(2) and (b)(1). These tools/services enabled the reproduction of decrypted audio files, their conversion to raw formats, and subsequent storage and reuse in Suno's training data lake.

210.   On information and belief, Suno also procured or coordinated with third-party "ripper" services or vendors (presently named as Unknown Defendants) that trafficked in circumvention technologies and provided Suno with decrypted audio at scale, or with turnkey services to defeat access controls on licensed platforms and digital storefronts, thereby facilitating Suno's mass reproduction of protected works.

211.   As further alleged in Count VI, Suno's ingestion pipeline removed or altered CMI and segmented files to anonymize origins, thereby concealing and facilitating the underlying anti-circumvention and downstream copying. The reproduction of audible watermarks/producer tags in Suno's outputs is

consistent with copying from decrypted sources rather than clean stems, further corroborating circumvention at ingestion.

212.  Suno's conduct was knowing and willful. Its investors publicly admitted Suno chose to proceed "without the constraints" of licensing, and Suno refuses to disclose its training data. No statutory exemption applies: Suno's activities are not nonprofit library/archival uses, interoperability reverse-engineering, encryption research, or security testing; they are commercial, large-scale data acquisition for a for-profit generative-AI service.

213.  These anti-circumvention violations are independent of any underlying infringement liability, and "fair use" is not a defense to § 1201 circumvention or trafficking claims.

214.  Suno's violations caused and continue to cause irreparable harm, including loss of control over access to Plaintiffs' works, facilitation of unlicensed reproductions used to train Suno's models, impairment of licensing markets, and concealment of copying through removal of CMI, all at industrial scale.

215.  Under 17 U.S.C. § 1203, Plaintiffs and the § 1201 Subclass seek: (a) permanent injunctive relief prohibiting further circumvention and trafficking; (b) impoundment and destruction of any circumvention technologies, devices, components, scripts, or services in Suno's possession, custody, or control, and deletion of any decrypted copies obtained via circumvention; (c) statutory damages of not less than $200 and not more than $2,500 per act of circumvention, access, or trafficking in violation of § 1201,

88

and/or actual damages and profits, as the Court deems just; (d) costs and

reasonable attorneys' fees; and (e) any other relief the Court deems proper.

## Count VIII

### False Copyright Management Information (DMCA § 1202(a))

*Brought on behalf of the DMCA Subclass, Copyright Class, the Unregistered
Copyright Class, the Lyrics Copyright Subclass, the
Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric)
Registered and Previously-Unregistered Subclasses*

216.   Plaintiffs reallege and incorporate by reference the allegations

contained in ¶¶1-132 as though fully set forth here.

217.   The Digital Millennium Copyright Act ("DMCA") prohibits any

person from knowingly and with the intent to induce, enable, facilitate, or

conceal infringement: "(1) provid[ing] copyright management information that is

false; or (2) distribut[ing] or import[ing] for distribution copyright management

information that is false." 17 U.S.C. § 1202(a).

218.   "Copyright management information" ("CMI") includes, inter alia:

(a) the title and other identifying information for a work, (b) the name of the

author, (c) the name of the copyright owner, (d) terms and conditions for use of

the work, and (e) identifying numbers or symbols referring to such information,

when conveyed in connection with copies or phonorecords of a work. 17 U.S.C.

§ 1202(c).

219.   On information and belief, Suno provides and distributes false CMI

in multiple, independent ways, including but not limited to:

a.   Suno embeds digital watermarks within the generated music,

using unique interactions between instruments, dynamics, and spatial

placement to create a unique signature that identifies Suno as the source of the digital file. While such watermarks are not a simple visual watermark, the technology is designed to be detectable by Suno or other systems, even if attempts are made to alter the audio.

b. Attribution lines and author/owner credits affixed to Suno output pages and share cards that label AI-generated tracks as "by" the Suno account handle of the prompting user (e.g., "by [username]"), thereby falsely identifying that user as the author and/or owner of the underlying musical work and sound recording when the output contains protected expression extracted or reproduced from Plaintiffs' works. These attribution lines are displayed on output file pages and share artifacts in connection with the copies/phonorecords themselves, thereby conveying CMI 'in connection with' the works within the meaning of 17 U.S.C. §1202(c).

c. Ownership claims Suno assigns to itself or to users by default, as reflected in Suno's own help center: Suno states paid-tier users "are considered the owner of the song" and free-tier outputs are "owned by Suno," and encourages commercial exploitation by paid users. When those outputs incorporate protected expression from Plaintiffs' recordings or lyrics, Suno's owner/author designations are false CMI that it provides and distributes in connection with the works.

d. Audio "producer tag"/identity markers reproduced in outputs, such as the "CashMoneyAP" producer tag and similar audible identifiers, which Suno's models recreate even though the tagged producer did not, in fact, create

90

or authorize the new track. The presence of such tags falsely identifies authorship/ownership in connection with the output and thus constitutes false CMI. These events occur against the backdrop of Suno's deliberate stripping of original CMI during ingestion and training.

      e.  False or misleading terms-of-use indicators conveyed with outputs (e.g., labeling outputs as owned by the user or by Suno; indicating broad commercial rights) that contradict the rights of Plaintiffs in the incorporated expression and thus constitute false CMI regarding "terms and conditions for use."

220.  As already alleged, Suno's training pipeline removes and disassociates genuine CMI (e.g., ID3 tags, embedded credits, audible watermarks) from Plaintiffs' recordings and lyrics and then distributes outputs devoid of that CMI. Suno simultaneously substitutes its own or its users' identifiers and ownership labels (webpage "by" lines, ownership statements for paid users, and Suno's claimed ownership of Basic/free outputs), thereby providing "false CMI" in connection with those outputs.

221.  Suno knew the CMI it provided and distributed was false. Suno: (i) publicly represents that paid users (or Suno itself for free users) own outputs even though Suno designed its system to ingest and reproduce protected elements of existing recordings and lyrics; (ii) removed authentic CMI during ingestion to frustrate traceability; and (iii) deployed the platform at commercial scale with knowledge that outputs would be labeled as authored/owned by someone other than the true rightsholders.

91

222.   Suno acted "with the intent to induce, enable, facilitate, or conceal infringement." 17 U.S.C. § 1202(a). Suno's false "author/owner" designations and commercialization messaging are designed to (and do) induce and enable wide distribution and monetization of outputs, to conceal that Plaintiffs' protected expression was copied during training, and to frustrate licensing and attribution markets by misdirecting content-ID systems and downstream licensees.

223.   Each instance in which Suno: (a) displays a Suno output page or share card with "by [username]"; (b) communicates that Suno or the user is the owner of a track that incorporates Plaintiffs' protected expression; (c) reproduces third-party producer tags or similar identifiers suggesting false authorship; or (d) distributes such outputs through Suno's site, APIs, Discord/Mobile apps, or partner integrations (e.g., Microsoft Copilot/Alexa), constitutes a separate violation of § 1202(a).

224.   Suno's violations are willful. Suno launched and scaled its platform while acknowledging copyright disputes were an expected by-product; it intentionally removed authentic CMI and replaced it with its own/user CMI to grow usage and revenue, despite obvious risks to rightsholders.

225.   As a direct and proximate result, Plaintiffs and Class members suffered and will continue to suffer harm, including market confusion, lost or impaired licensing opportunities, dilution of attribution value, misdirection of content-ID and royalty systems, and the concealment of underlying infringements. Monetary relief alone is inadequate.

226.   Plaintiffs seek all remedies available under 17 U.S.C. § 1203, including: (a) statutory damages for each act of providing or distributing false CMI; (b) permanent injunctive relief enjoining Suno from providing or distributing false CMI and requiring corrective measures (including reasonable technical means to attach accurate CMI, corrective notices on Suno output pages, and best-efforts notices to major distributors/partners to correct false CMI already disseminated); (c) disgorgement of profits attributable to false-CMI conduct; (d) costs and attorneys' fees; and (e) any further relief the Court deems just and proper.

**Count IX**

**Contributory Copyright Infringement,**
**Sound Recordings and Lyrics, 17 U.S.C. § 101 et seq.**

*Brought on behalf of the Copyright Class, the Unregistered*
*Copyright Class, the Lyrics Copyright Subclass,*
*the Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric)*
*Registered Subclass, and Musical-Composition (Non-Lyric) Unregistered Subclass*

227.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-132 as though fully set forth here.

228.   Plaintiffs bring this claim individually and on behalf of the Copyright Class, the Previously Unregistered Copyright Class, the Lyrics Copyright Subclass, the Previously-Unregistered-Lyrics Subclass, Musical-Composition (Non-Lyric) Registered Subclass, and Musical-Composition (Non-Lyric) Previously-Unregistered Subclass.

229.   Third parties have directly infringed Plaintiffs' exclusive rights by reproducing, preparing derivative works from, distributing, publicly performing,

and/or displaying works that copy protected expression from Plaintiffs' sound recordings and lyrics without authorization:

a. End-users of Suno's platform who, using Suno's models and interfaces, generate, fix, and disseminate AI-created audio files and lyrics that are substantially similar to Plaintiffs' protected works, and then upload, stream, synchronize, or otherwise distribute those files on platforms such as YouTube, TikTok, Spotify, Instagram, and SoundCloud.

b. Data suppliers and compilers (Unknown Defendants) who reproduced and distributed Plaintiffs' recordings and lyrics to Suno for ingestion into training and fine-tuning datasets without license or permission.

c. Technology and distribution partners who, at Suno's direction or with Suno's material assistance, reproduce and distribute infringing outputs through integrated channels (including Microsoft Copilot and Amazon Alexa experiences), thereby making such outputs available to the public.

230. Suno had actual knowledge that its platform and datasets were being used for infringement (and, at minimum, was willfully blind):

a. Suno publicly acknowledged training "on existing copyrighted music" while invoking "fair use," demonstrating knowledge that unlicensed copying had occurred.

b. A lead investor admitted Suno "needed to make this product without the constraints" of licensing, anticipating "litigation" from music owners, confirming awareness that Suno's approach would drive infringement.

c. Suno refuses to identify the contents and provenance of its training data, labeling it "confidential," despite recurring public reports of outputs echoing recognizable protected elements, facts that put Suno on notice of ongoing infringements by users and data suppliers.

231. Suno also had constructive knowledge and was willfully blind because (i) its own pipeline intentionally strips and slices CMI from training inputs (making provenance detection harder), (ii) it is aware of overfitting and memorization risks, and (iii) it scaled commercial features that predictably yield infringing outputs.

232. Suno materially contributes to third-party infringement by providing the instruments and services that are the but-for technological cause of the infringements and by taking affirmative steps that facilitate and amplify them:

a. *Supplying the means*: Suno provides the models, servers, and interfaces that generate, fix, and deliver the infringing copies; absent Suno's systems, the specific files at issue would not exist.

b. *High-volume commercialization*: Suno's Pro and Premier tiers allow massive daily generation and grant commercial use, encouraging users to create and monetize outputs that substitute for Plaintiffs' works.

c. *Enhancement tools that increase substitutability*: Features such as "ReMaster" (to upgrade fidelity) and "Personas" (to persist stylistic/vocal signatures) make outputs more market-ready and more likely to mimic distinctive, protectable expression.

d. *Integrated distribution*: Suno's integrations (e.g., Copilot; Alexa) reduce friction to public dissemination, materially assisting the reproduction and distribution of infringing outputs.

e. *CMI removal and provenance obfuscation*: Suno's intentional removal/alteration of CMI and audio/text anonymization (ID3/title/artist/publisher/ISRC/ISWC removal; segmentation) foreseeably facilitates infringement by concealing ownership and frustrating rights-management.

f. *Failure to implement effective safeguards despite knowledge*: With awareness of overfitting and near-verbatim regeneration risks, Suno failed to deploy or enforce effective guardrails to prevent outputs substantially similar to Plaintiffs' recordings or lyrics.

233. Independently and additionally, Suno intentionally induces infringement. Suno's public messaging and product design show an objective of promoting infringing uses: marketing "radio-quality" tracks "ready for mainstream airplay," releasing tools to create persistent "Personas," offering commercial-use tiers that scale with output volume, and integrating rapid distribution channels—while eschewing licensing "constraints."

234. On information and belief, Suno end-users have generated outputs that copy protectable elements of Plaintiffs' works (including distinctive melodies, hooks, riffs, rhythmic figures, chord progressions arranged in a protectable selection/sequence, and lyric lines/phrases), and have uploaded and monetized those outputs on third-party platforms without authorization.

235.   Suno's conduct is a but-for and proximate cause of the third-party infringements. The infringements occurred through, and because of, Suno's models, interfaces, product features, pricing, and integrations.

236.   Suno is not entitled to DMCA safe-harbor protections for the conduct alleged: it is not merely a passive host storing material at a user's direction; it actively creates, manipulates, and disseminates the content and intentionally removes/obscures CMI (as separately alleged. This claim arises independently of, and in addition to, Suno's direct and DMCA violations.

237.   As a direct and proximate result of Suno's contributory infringement and inducement, Plaintiffs and the Classes have suffered and will continue to suffer irreparable harm and damages, including (without limitation) lost licensing revenue and opportunities, market substitution and dilution, harm to catalog value, and loss of control over the presentation and integrity of their works.

238.   Plaintiffs seek all remedies available under the Copyright Act, including but not limited to: (i) preliminary and permanent injunctive relief enjoining Suno from materially contributing to or inducing infringement and requiring implementation of effective guardrails (including provenance logging, dataset segregation/deletion of unlicensed materials, CMI restoration, and output-filtering that blocks near-verbatim/regenerations of protected melodies, lyrics, and distinctive elements); (ii) statutory damages for registered works, or, in the alternative, actual damages and Suno's profits; (iii) costs and attorneys' fees; and (iv) any further relief the Court deems just and proper. With respect

to any United States works encompassed by this Count that were unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act as to any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be supplemented to include the relevant registration(s). Nothing in this paragraph limits claims as to works that are not "United States works" within the meaning of 17 U.S.C. § 411(a).

## Count X

### Vicarious Copyright Infringement, Sound Recordings and Lyrics, 17 U.S.C. § 101 et seq.

*Brought on behalf of the Copyright Class, the Unregistered Copyright Class, the Lyrics Copyright Subclass, and the Previously-Unregistered-Lyrics Subclass*

239.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-132 as though fully set forth here.

240.   This Count is brought by Plaintiffs individually and on behalf of the Copyright Class, the Previously Unregistered Copyright Class, the Lyrics Copyright Subclass, and the Previously-Unregistered-Lyrics Subclass.

241.   Plaintiffs and the Classes own or control the exclusive rights under 17 U.S.C. § 106 in the sound recordings and musical-composition lyrics identified in Exhibit A (and additional works to be identified in discovery), including the rights to reproduce, prepare derivative works from, distribute, and publicly perform their works.

242.   In addition to directly infringing and contributing to infringement as alleged elsewhere, Suno is vicariously liable for copyright infringement by third parties, including but not limited to: (i) Suno's users who, through Suno's platform, generate, copy, distribute, publicly perform, and commercially exploit AI-generated audio that is derivative of, substantially similar to, or otherwise infringes Plaintiffs' works; and (ii) Suno's contractors, vendors, data partners, and other Unknown Defendants who scraped, copied, supplied, processed, or prepared Plaintiffs' works for Suno's training, fine-tuning, evaluation, filtering, or commercialization pipelines.

243.   At all relevant times, Suno had, and exercised, the right and ability to supervise and control the infringing activity carried out through its service and by third parties acting for its benefit. Among other things, Suno: (a) exclusively operates, configures, and maintains the servers, models, and interfaces that generate the infringing audio; (b) designs, selects, and updates the training and fine-tuning corpora and model guardrails; (c) implements (or chooses not to implement) prompt and output filters capable of preventing generation of infringing outputs; (d) sets and enforces usage rules, credit limits, and content policies; (e) can identify, block, rate-limit, or suspend users and specific prompts/outputs; (f) curates, promotes, and upgrades outputs (e.g., via "Personas," "ReMaster," and similar product controls) that it determines will be available and in what form; and (g) controls third-party integrations (e.g., via APIs, Copilot/Alexa channels) through which infringing outputs are generated

and disseminated. Suno's ability to prevent or limit the infringing activity, coupled with its failure to do so, satisfies the supervisory-control element.

244. With respect to third-party data suppliers, contractors, or vendors (the Unknown Defendants), Suno likewise possessed the contractual right to monitor, direct, accept, reject, or require re-processing of the data and code those entities acquired or prepared for Suno's training pipelines, as well as the right to terminate or modify those relationships. Suno's oversight and acceptance of training data and processing work, despite their infringing nature, further establishes Suno's right and ability to supervise the underlying infringement.

245. Suno also received a direct financial benefit from the infringing activity. Suno's revenues and enterprise value scale with the volume, virality, and commercial utility of outputs generated and shared by users, including outputs that are derivative of or substantially similar to Plaintiffs' works. By: (a) offering tiered, usage-based subscriptions that monetize each batch of outputs; (b) marketing Suno as a frictionless alternative to licensed music creation and synchronization; (c) enabling commercial exploitation of AI-generated audio; and (d) expanding distribution through high-exposure integrations (e.g., with major platforms and consumer devices), Suno attracts and retains paying users specifically because its system can generate music that substitutes for, or trades on, Plaintiffs' protected expression. The availability of infringing outputs thus draws users, increases engagement and upgrades, and fuels

100

revenue and valuation, conferring a direct financial benefit that is causally tied to the infringing activity.

246.   Suno's internal product choices (e.g., longer song durations; more realistic vocals; "Personas"; "ReMaster") and growth marketing campaigns are designed to heighten output fidelity and recognizability, thereby increasing the substitutability of those outputs for licensed music and enhancing Suno's commercial appeal. Suno's investors and executives have publicly acknowledged that operating "without licensing constraints" was a deliberate strategy to accelerate product quality and growth—underscoring that infringement-driven capabilities and usage were material drivers of Suno's financial success.

247.   By virtue of the foregoing, Suno is vicariously liable for the infringing acts of its users and of third parties acting for its benefit. Suno had the right and ability to supervise and control the infringement and received a direct financial benefit from it.

248.   Suno's conduct was and is willful and undertaken in reckless disregard of Plaintiffs' rights.

249.   Plaintiffs and the Classes are entitled to all remedies available under the Copyright Act, including injunctive relief (17 U.S.C. § 502), statutory damages for registered works (17 U.S.C. § 504(c)), or, in the alternative, actual damages and Suno's profits attributable to the infringement (17 U.S.C. § 504(b)), costs and attorneys' fees (17 U.S.C. § 505), and such other and further relief as the Court deems just and proper. With respect to any "United

States works" encompassed by this Count that were unregistered at the time of filing, Plaintiffs have filed or will promptly file registration applications and will supplement this pleading with certificate details when issued. Plaintiffs do not seek adjudication or entry of relief under the Copyright Act as to any such work unless and until registration (or refusal) has issued; upon issuance, this Count shall be deemed automatically supplemented to include the relevant registration(s). Nothing in this paragraph limits claims as to works that are not "United States works" within the meaning of 17 U.S.C. § 411(a).

### Count XI

### Violation of Illinois Biometric Information Privacy Act, 740 ILCS 14/1 et seq.)

*Brought on behalf of the Illinois Biometric Information Privacy Act Subclass*

250.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-132 as though fully set forth here.

251.   Plaintiffs Woulard and the Burjek Plaintiffs bring this claim individually and on behalf of all other Illinois Biometric Information Privacy Act Subclass members.

252.   The Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS § 14/1 et seq., regulates the collection, use, storage, and dissemination of biometric identifiers, including "voiceprints," and prohibits private entities from collecting or using biometric data without explicit, informed written consent.

253.   The claims in this Count XI seek protection of Plaintiffs' unique biometric privacy rights under Illinois law, distinct and qualitatively different from rights granted under federal copyright law. BIPA safeguards personal

biometric information independently from rights relating to the reproduction or distribution of creative works.

254. Certain Plaintiffs are residents of Illinois, have recorded music or distinctive vocal tags clearly identifiable as their own voices, and therefore possess protectable biometric identifiers as defined by BIPA. These voiceprints serve as unique biometric identifiers that can reliably distinguish Plaintiffs from other individuals.

255. On information and belief, Suno systematically collected, captured, copied, and stored Plaintiffs' distinctive biometric identifiers, including recognizable voiceprints or artist voice tags, when ingesting Plaintiffs' sound recordings into its generative AI training datasets. For each Illinois Plaintiff, Suno computed and stored speaker-embedding vectors—fixed-length numerical templates derived from spectral features that uniquely identify the individual across recordings. These voiceprints permit re-identification and are biometric identifiers under 740 ILCS 14/10. Suno captured, stored, and used these voiceprints without the written policies and informed consent BIPA requires.

256. These embeddings are biometric identifiers under BIPA, not mere audio. Each scan/capture is a separate violation.

257. For Illinois residents whose voices were captured, the capture and resulting injuries occurred primarily and substantially in Illinois.

258. Suno never obtained Plaintiffs' consent, let alone the informed written consent explicitly required by BIPA, to collect, capture, store, or otherwise use Plaintiffs' biometric identifiers. Plaintiffs were never informed

about the specific purpose, duration, or terms regarding Suno's use and storage of their voiceprints.

259.   Upon information and belief, Suno retains Plaintiffs' biometric identifiers indefinitely within its AI training data and subsequent generative outputs. Suno's continued use and storage of Plaintiffs' biometric data without consent directly violates 740 ILCS §§ 14/15(a) and 14/15(b).

260.   Suno failed to develop, publicly disclose, and comply with a written retention schedule and guidelines for permanent destruction as required by 740 ILCS 14/15(a).

261.   Suno further commercially exploits these biometric identifiers by generating AI music outputs that clearly reproduce Plaintiffs' distinctive voices, vocal signatures, or artist tags. These outputs, publicly accessible through Suno's commercial platform, distribute Plaintiffs' biometric identifiers widely without Plaintiffs' consent, violating 740 ILCS 14/15(c) and (d).

262.   By systematically collecting, storing, using, and commercially disseminating Plaintiffs' biometric voiceprints without consent or notice, Suno has recklessly or intentionally violated multiple provisions of BIPA. Given Suno's sophistication and public acknowledgments of the lack of licensing agreements or consents, its conduct was knowing and deliberate, or at a minimum, reckless.

263.   Suno profited from the collection, capture, storage, and use of Plaintiffs' biometric identifiers (voiceprints) by embedding them in model parameters and internal corpora to create and sell AI music services, conduct

prohibited by 740 ILCS 14/15(c), and disclosed biometric identifiers to employees/contractors and partners through access to retained corpora and evaluation artifacts in violation of 740 ILCS 14/15(d).

264.   Plaintiffs have suffered, and continue to suffer, substantial and irreversible harm as a result of Suno's unlawful collection, storage, dissemination, and commercial exploitation of their biometric identifiers. This harm includes the loss of control over highly personal biometric data, increased risk of identity misuse, dilution of their personal and professional identities, diminished licensing opportunities, and ongoing threats to their privacy and autonomy as artists.

265.   Under BIPA, Plaintiffs seek statutory damages of $5,000 for each intentional or reckless violation (or alternatively $1,000 per negligent violation), injunctive relief requiring Suno to delete Plaintiffs' biometric data and cease any further use or dissemination, and reimbursement of attorneys' fees and litigation expenses, pursuant to 740 ILCS 14/20.

## Count XII

### Violation of Illinois Right of Publicity Act (IRPA), 765 ILCS 1075/1 et seq.

*Brought on behalf of the Illinois Right of Publicity Act Subclass*

266.   Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-132 as though fully set forth here.

267.   Plaintiffs Woulard and the Burjek Plaintiffs (the "IRPA Plaintiffs") bring this Count individually and on behalf of the Illinois Right of Publicity Act Subclass (the "IRPA Subclass").

268.   IRPA recognizes each individual's right "to control and to choose whether and how to use [their] identity for commercial purposes," and prohibits using an individual's identity for a commercial purpose during their lifetime without prior written consent. "Identity" includes, without limitation, a person's name, signature, photograph, image, likeness, and voice; "commercial purpose" includes use in advertising or promoting products or services, or on/within products or services.

269.   Suno used IRPA Plaintiffs' and IRPA Subclass members' identities, including their voices and distinctive vocal attributes, for commercial purposes without written consent. Suno did so by:

a.   Training and fine-tuning its models on recordings embodying plaintiffs' uniquely identifiable voices, thereby capturing and modeling their vocal identities; and

b.   Generating and disseminating outputs that replicate or closely simulate plaintiffs' distinctive voices, vocal timbre, tags, or other identifiers, and using those outputs, and the ability to generate them, to market, promote, and sell Suno's subscription service (including via Microsoft Copilot and Amazon Alexa integrations), and to drive paid tiers.

270.   Suno knew or should have known the voices and vocal signatures in Plaintiffs' recordings are core components of "identity" under IRPA and that exploiting those attributes for advertising, promotion, and monetization required prior written consent.

271.   Suno did not obtain IRPA Plaintiffs' or IRPA Subclass members' written consent to use their identities for any commercial purpose.

272.   Suno's commercial uses included, inter alia, advertising and promoting Suno's AI product and paid tiers; driving subscription sales by highlighting the service's capacity to generate human-sounding vocals; and encouraging public dissemination of outputs on platforms such as YouTube, TikTok, Instagram Reels, and Spotify, all to increase Suno's revenue and market share.

273.   IRPA protects identity-based rights (name/voice/likeness), which are distinct from rights protected by the Copyright Act.

274.   Suno's use of identities to promote and sell its service is classic commercial use not immunized by the First Amendment. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518–22 (7th Cir. 2014).

275.   Suno's conduct is not news, public affairs, or a noncommercial account of public interest; it is the sale, advertising, and promotion of a for-profit AI music service.

276.   As to IRPA Plaintiffs and the IRPA Subclass, the challenged uses and injuries occurred primarily and substantially in Illinois: Suno marketed and sold subscriptions in Illinois, ingested and exploited Illinois artists' voices, and disseminated voice-simulative outputs to and within Illinois.

277.   Suno's violations were willful and reckless. Suno and its investors publicly acknowledged launching and scaling "without licensing constraints,"

while touting human-like vocals and rapid commercial growth—facts corroborating intentional commercial use of identity without consent.

278.    IRPA Plaintiffs and the IRPA Subclass suffered and continue to suffer injuries, including loss of control over their identities, dilution and commodification of their voices, reputational harm, and economic losses (including diversion of licensing value in their personas and diminished market for authentic performances).

279.    Suno's violations are ongoing and continuing: each new training pass, model update, marketing use, and distribution of voice-simulative outputs within the limitations period constitutes a fresh IRPA violation; discovery has been impeded by Suno's refusal to disclose training data and sources, warranting tolling and/or the discovery rule as appropriate.

**Count XIII**

**Violation of Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/1 et seq. (Injunctive Relief)**

*Brought on behalf of the Illinois UDTPA Subclass*

280.    Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-132 as though fully set forth here.

281.    Plaintiffs and class members are engaged in trade and commerce in Illinois and nationwide by creating, licensing, and selling music, sound recordings, and lyrics. Suno conducts substantial business in Illinois and directs its marketing and services into this District. Suno's challenged practices occurred "in the course of business" and affect commerce within Illinois.

282.   The UDTPA prohibits deceptive trade practices, including: passing off goods or services as those of another; causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; causing likelihood of confusion as to affiliation, connection, or association with another; representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have; representing that goods or services are of a particular standard, quality, or grade if they are of another; and engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding. 815 ILCS 510/2(a)(1)–(3), (5), (7), (12).

283.   In the course of its business, Suno has engaged in deceptive trade practices within the meaning of 815 ILCS 510/2 by, among other things:

a.   *Passing off/sponsorship & approval*: designing, training, and promoting a system that generates recordings "indistinguishable from human-created music" and that reproduce distinctive artist identifiers (e.g., producer/artist tags), thereby creating a likelihood of confusion that AI outputs are authorized by, affiliated with, sponsored by, or approved or certified by the real artists and rights-holders whose identities and recordings Suno leveraged.

b.   *"Original/royalty-free/commercial-ready" claims*: marketing and enabling commercial exploitation of Suno outputs as "original" or otherwise suitable for downstream commercial use while omitting or obscuring material facts about (i) Suno's ingestion of unlicensed works to build the system and (ii) the risk of confusion, affiliation, and rights encumbrances that follow. These

representations misstate the characteristics and benefits of Suno's
goods/services and are likely to mislead users, licensees, platforms, and the
public.

c. *Affiliation/association*: deploying and integrating Suno's system
into mainstream consumer channels (e.g., Microsoft Copilot, Amazon's Alexa
ecosystem) in a manner that reinforces the mistaken impression that outputs
are endorsed by, affiliated with, or derived from licensed catalogs or living
artists, when they are not.

d. *Quality/standard misrepresentation*: representing outputs as
"radio-quality" and "indistinguishable from human" while simultaneously
relying on unlicensed ingestion and replication of distinctive artist expression
and voice identifiers that foster market confusion regarding origin and
authorship and blur the line between genuine artist recordings and Suno
outputs.

284.   These practices are likely to cause confusion among consumers,
licensees, platforms, distributors, and the public as to the source, sponsorship,
approval, or affiliation of Suno outputs, and as to whether Suno has obtained
appropriate licenses or approvals from the artists and rights-holders whose
identities and copyrighted recordings Suno leveraged.

285.   Plaintiffs and class members are persons "likely to be damaged" by
Suno's deceptive trade practices within the meaning of 815 ILCS 510/3. Among
other harms: confusion diverts demand, depresses licensing prices, impairs
brand/artist goodwill, and undermines the integrity and provenance of

Plaintiffs' works and identities, including where Suno's outputs echo distinctive producer or artist "audio tags."

286.  No actual damages need be proven for UDTPA injunctive relief, and proof of actual confusion is not required; a likelihood of confusion or likelihood of damage suffices under 815 ILCS 510/3.

287.  This claim is not preempted by the Copyright Act, 17 U.S.C. § 301, because it requires extra elements—deceptive conduct and likelihood of confusion as to source, sponsorship, approval, affiliation, and product characteristics—that are qualitatively different from the exclusive rights protected by copyright. Plaintiffs seek injunctive and ancillary equitable relief tailored to prevent marketplace deception, not to vindicate mere rights of reproduction or distribution.

288.  Suno's deceptive trade practices were and are willful. Suno and its investors publicly acknowledged a strategy of operating "without constraints" and knowingly courting litigation risk rather than obtaining licenses, while simultaneously promoting its service for mass commercial exploitation in ways likely to mislead consumers about authorization and provenance.

289.  Plaintiffs seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including orders that Suno shall:

a.  Cease making or implying claims in Illinois (marketing, UI/UX, FAQs, ToS, partner integrations) that Suno outputs are "original," "royalty-free," "fully cleared," "commercial-ready," or otherwise free of

third-party rights unless Suno (i) possesses, and (ii) clearly discloses the existence and scope of appropriate licenses.

b.  Implement clear, prominent disclosures (pre- and post-generation) stating that Suno outputs may not be authorized, sponsored, or approved by any referenced artist/label/publisher and may implicate third-party rights.

c.  Disable and/or effectively filter prompts and outputs within Illinois that are likely to cause confusion as to source, affiliation, sponsorship, or approval, including outputs that reproduce or emulate identifiable producer/artist "audio tags," distinctive voiceprints, or other source-identifying indicia (without written authorization from the identified person or rights-holder).

d.  Add durable machine-readable provenance/watermarking to all outputs distributed into Illinois that (i) identifies Suno as the generative source and (ii) states that the output is not an authentic recording by any human artist unless expressly authorized.

e.  Provide corrective notices through Illinois-facing marketing channels and partner integrations (e.g., Microsoft Copilot/Alexa placements used in Illinois) clarifying that Suno outputs are not sourced from, endorsed by, or affiliated with specific artists or labels absent express disclosure.

f.  Institute and publish a UDTPA compliance program (policies, training, human-in-the-loop review, and auditing) designed to prevent future confusion about source, sponsorship, affiliation, and authorization.

112

g. Pay Plaintiffs' costs and reasonable attorneys' fees pursuant to 815 ILCS 510/3 because Suno has willfully engaged in deceptive trade practices knowing them to be deceptive.

**Count XIV**

**Unjust Enrichment (Illinois Common Law)**

*Brought on behalf of the Unjust Enrichment Subclass*

290. Plaintiffs reallege and incorporate by reference the allegations contained in ¶¶1-132 as though fully set forth here.

291. This Count is brought on behalf of the Illinois Unjust Enrichment Subclass (the "Unjust Enrichment Subclass") and, to the extent Illinois law is applied on a classwide basis, on behalf of all Plaintiffs and Class members whose injuries occurred in Illinois. Plaintiffs plead this Count in the alternative to their legal claims pursuant to Fed. R. Civ. P. 8(d)(2)–(3).

292. Suno retained and continues to retain concrete benefits derived from Plaintiffs' and the Unjust Enrichment Subclass's works, identities, and market goodwill, including but not limited to:

a. avoided licensing fees and acquisition costs for audio and lyric datasets;

b. accelerated time-to-market and model quality improvements that drove user growth, enterprise integrations (e.g., Microsoft Copilot), and platform stickiness;

c. subscription revenues from Free/Pro/Premier tiers designed to scale output volume and commercial exploitation; and

    d. capital raises and increased valuation (e.g., Suno's $125 million Series B) fueled by product capabilities built on unlicensed training data.

293. These retained benefits were obtained at Plaintiffs' and the Unjust Enrichment Subclass's expense: Suno's model quality and market expansion were built on unconsented copying/ingestion of recordings and lyrics and on the removal/obfuscation of CMI (authors, performers, publishers, ISRC/ISWC, producer tags), which eliminated licensing opportunities, impaired attribution, and diluted catalog value.

294. Suno's enrichment is "unjust" because it is predicated on wrongful conduct beyond simple reproduction rights, including:

    a. DMCA § 1202(b) CMI removal/alteration in Suno's "strip-and-slice" pipeline (conversion to raw formats, metadata stripping, segmentation), intentionally concealing sources and depriving rightsholders of attribution and licensing signals.

    b. BIPA violations through collection, storage, and commercialization of Illinois artists' voiceprints and distinctive vocal identifiers without the informed written consent BIPA requires), a privacy-based extra element independent of any § 106 right.

    c. IRPA violations through use of distinctive voices/identities for commercial purposes without consent, rights not preempted by the Copyright Act.

295. Independently and in the alternative, Suno's retention of benefits is unjust because Suno systematically leveraged Plaintiffs' and the Unjust

Enrichment Subclass's creative outputs to flood the market with AI-generated tracks, displacing demand and licensing revenue that would otherwise accrue to rightsholders.

296.   Suno's benefits are directly linked to the challenged misconduct: the more copyrighted/lyric content and biometric/identity data Suno ingested (while stripping CMI), the more "radio-quality" outputs it produced, which Suno monetized via subscriptions, enterprise integrations, and fundraising predicated on product capability and growth.

297.   Equity will not permit Suno to retain the above benefits, acquired and maintained through the concealment of origin (CMI removal), exploitation of Illinois artists' voiceprints without consent (BIPA), and appropriation of identity (IRPA), without paying restitution to those whose works and identities supplied the value.

298.   This Count is pled in the alternative and is expressly tethered to non-copyright wrongs (e.g., § 1202 CMI removal, BIPA, and IRPA). To the extent any aspect overlaps with rights equivalent to 17 U.S.C. § 106, Plaintiffs seek restitution only where an extra element renders the claim qualitatively different and not preempted.

299.   To the extent legal remedies under the Copyright Act, DMCA, or BIPA are inadequate to disgorge Suno's full unjust gains (including valuation windfalls and enterprise synergies), equity requires restitution and ancillary relief.

300.   Plaintiffs and the Unjust Enrichment Subclass seek:

a.   Restitution of the value unjustly obtained, measured by (without limitation): (i) avoided licensing/acquisition costs for training sets; (ii) a fair share of subscription and enterprise revenues attributable to AI capabilities trained on Plaintiffs' works; (iii) unjust gains reflected in fundraising and post-money valuation increases causally tied to the challenged conduct; and (iv) the value of data assets/models derived from unlawfully obtained inputs.

b.   Disgorgement of profits and an equitable accounting to trace, quantify, and return all benefits derived from the unlawful conduct, including ancillary partnership/integration consideration (e.g., product integrations that monetized model capabilities).

c.   Imposition of a constructive trust over revenues and assets (including models, weights, datasets, and derivative products) unjustly enriched by Plaintiffs' works and identities, pending accounting and restitution.

d.   Injunctive relief preventing further retention or use of unjust gains and requiring corrective measures (including restoration/maintenance of CMI where feasible), without prejudice to broader injunctive relief sought elsewhere in the Complaint.

e.   Pre- and post-judgment interest and such other equitable relief as the Court deems just.

## **PRAYER FOR RELIEF**

301.   Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Suno and award the following relief:

a. *Class certification*: Find that this action satisfies the requirements for maintenance as a class action as set forth in Rule 23 of the Federal Rules of Civil Procedure, certifying the Classes and Subclasses defined herein, appointing Plaintiffs as representatives of the Classes, and appointing Plaintiffs' counsel as Class Counsel;

b. *Judgment*: Enter judgment in favor of Plaintiffs and all Class Members and against Defendant Suno on all counts;

c. *Injunctive Relief (Copyright Act)*: Grant a permanent injunction pursuant to 17 U.S.C. § 502 prohibiting Suno, its affiliates, subsidiaries, employees, agents, and all persons acting in concert or participation with it, from further copying, ingesting, reproducing, distributing, publicly performing, creating derivative works from, or otherwise commercially exploiting Plaintiffs' and class members' copyrighted sound recordings without authorization;

d. *Injunctive Relief (DMCA)*: Grant a permanent injunction pursuant to 17 U.S.C. §1203 requiring Suno, its affiliates, subsidiaries, employees, agents, and all persons acting in concert or participation with it, to cease all intentional removal, alteration, or obscuring of Copyright Management Information (CMI), and where feasible, to restore or properly attribute all previously removed or altered CMI;

e. *Injunctive Relief (Illinois BIPA)*: Grant a permanent injunction pursuant to 740 ILCS § 14/20 of the Illinois Biometric Information Privacy Act requiring Suno to immediately delete all biometric identifiers and biometric information collected from Illinois subclass members, prohibiting any further collection, storage, use, or dissemination of such biometric data without informed written consent, and mandating full compliance with all applicable BIPA provisions moving forward;

f. *Statutory Damages—Sound Recordings (Registered)*: For each sound recording owned by Plaintiffs and/or the Copyright Class that is eligible for statutory damages pursuant to 17 U.S.C. §§ 412 and 504(c), award statutory damages, at Plaintiffs' election under § 504(c), in amounts to be determined by the jury, including up to $150,000 per infringed work for willful infringement under § 504(c)(2), and otherwise as permitted by § 504(c)(1).

g. *Statutory Damages (Lyrics)*: Award Plaintiffs and the Lyrics Copyright Subclass statutory damages pursuant to 17 U.S.C. § 504(c) for each infringed musical-composition (lyric) registration — up to $150,000 per work for willful infringement (or up to $30,000 per work absent willfulness) — together with any enhanced damages, pre- and post-judgment interest, and such other relief the Court deems just and proper;

h. *Statutory Damages—Musical Compositions (Non-Lyric; Registered)*: For each registered musical-composition (non-lyric) work owned by Plaintiffs and/or the applicable Musical-Composition (Non-Lyric) Subclasses that is eligible for statutory damages pursuant to 17 U.S.C. §§ 412 and 504(c), award

118

statutory damages, at Plaintiffs' election under § 504(c), in amounts to be determined by the jury, including up to $150,000 per infringed work for willful infringement under § 504(c)(2), and otherwise as permitted by § 504(c)(1).

      i.   *Statutory Damages (DMCA/CMI)*: Award Plaintiffs and other class members statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(B) for each violation involving removal or alteration of CMI, in the maximum amount allowed by law;

      j.   Where statutory damages are available, Plaintiffs reserve the right, as permitted by law, to elect statutory damages or actual damages and profits on a work-by-work basis at any time before final judgment, subject to 17 U.S.C. § 412.

      k.   *DMCA § 1201 Injunction/Impoundment*: Permanent injunctive relief under 17 U.S.C. §1203 enjoining Suno from circumventing or trafficking in any technology, product, service, device, component, or part thereof that circumvents technological measures controlling access to, or protecting rights in, Plaintiffs' and the Classes' works; impoundment and destruction of any such circumvention technologies and deletion of decrypted copies obtained via circumvention.

      l.   *Impoundment/Destruction (17 U.S.C. § 503)*: Order impoundment and destruction of (i) all infringing copies of Plaintiffs' works in Suno's possession, custody, or control, including in datasets, caches, or intermediary files; and (ii) any model parameters/weights and embeddings shown to be

derived from Plaintiffs' works to the extent necessary to remedy ongoing infringement and prevent further harm.

m. *DMCA § 1201 Statutory Damages*: Statutory damages pursuant to 17 U.S.C. § 1203(c)(3)(A) of not less than $200 and not more than $2,500 per act of circumvention, access, or trafficking in violation of § 1201, or, at Plaintiffs' election, actual damages and Suno's profits.

n. *Statutory Damages—DMCA § 1202 (CMI)*: At Plaintiffs' election before final judgment, award statutory damages for each violation of 17 U.S.C. § 1202 in the sum of not less than $2,500 and not more than $25,000, together with any additional relief provided by § 1203.

o. *Statutory Damages (Illinois BIPA)*: Award Plaintiffs and other class members statutory damages under the Illinois Biometric Information Privacy Act, 740 ILCS § 14/20, including $5,000 for each intentional or reckless violation, or alternatively $1,000 per negligent violation, in the maximum amount permitted by law, plus reasonable attorneys' fees, costs (including expert fees), and other relief including injunctive relief as appropriate;

p. *Actual Damages and Disgorgement (Previously Unregistered Copyrights)*: Award Plaintiffs and other class members with previously unregistered copyrights, including owners of unregistered musical-composition (lyrics) copyrights, actual damages, including disgorgement of all profits attributable to Suno's unauthorized exploitation of their works, as permitted under applicable federal law;

120

q. *Declaratory Relief (Copyright Infringement)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Suno's unauthorized copying, ingestion, training, and commercial exploitation of Plaintiffs' and class members' sound recordings constitute copyright infringement under the Copyright Act;

r. *Declaratory Relief (DMCA/CMI)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Suno's intentional removal, alteration, or obscuring of Plaintiffs' and class members' CMI violates 17 U.S.C. § 1202(b) (removal/alteration of CMI) and § 1202(a) (false CMI);

s. *Declaratory Relief (Illinois BIPA)*: Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Suno's collection, use, storage, and dissemination of Illinois subclass members' biometric identifiers and biometric information violates the Illinois Biometric Information Privacy Act, 740 ILCS § 14/1 et seq.;

t. *IRPA Injunctive Relief*: Enter a permanent injunction under 765 ILCS 1075/40 enjoining Suno from using Plaintiffs' and IRPA Subclass members' identities, including their names, voices, signatures, photographs, images, likenesses, and any simulated or synthesized versions thereof, for any commercial purpose without prior written consent; and requiring deletion of models, datasets, and embeddings encoding such identities.

u. *IRPA Damages and Profits*: Award actual damages, Suno's profits attributable to the unauthorized uses, punitive damages, costs, and reasonable attorneys' fees as allowed by 765 ILCS 1075/40–/55.

v. *Injunctive Relief (UDTPA)*: Grant preliminary and permanent injunctive relief under 815 ILCS 510/3 as pleaded in the UDTPA count, including corrective advertising/disclosures, prompt/output filters to prevent source confusion, provenance labeling, Illinois-facing integration changes, a UDTPA compliance program, and an award of costs and reasonable attorneys' fees for willful violations.

w. *Unjust Enrichment (Illinois)*: Award restitution and disgorgement of benefits unjustly retained, and impose a constructive trust as necessary to prevent unjust enrichment under Illinois law.

x. *Impoundment and Destruction, 17 U.S.C. § 503; DMCA § 1203(b)*: Order the impoundment of all infringing copies and any devices or products involved in violations, and upon final judgment, the destruction or other reasonable disposition of (i) all copies/phonorecords and all articles by which such copies or phonorecords may be reproduced, and (ii) any device or product involved in DMCA violations; including datasets, caches, shards, training checkpoints and, to the extent necessary to abate ongoing infringement, model parameters/weights and embeddings derived from Plaintiffs' works, or remedial modification sufficient to prevent further use of infringing material.

y. *Accounting and Disgorgement*: Order an accounting of Defendants' revenues and profits attributable to the infringements and DMCA violations, and disgorgement of such profits.

z. *Attorneys' Fees and Costs*: Award Plaintiffs their reasonable attorneys' fees and costs under 17 U.S.C. § 505 (copyright), 17 U.S.C. §

1203(b)(4)–(5) (DMCA), 740 ILCS 14/20(3) (BIPA), and 765 ILCS 1075/55 (IRPA), and as otherwise permitted by law.

      aa.   *Pre- and Post-Judgment Interest*: Award pre- and post-judgment interest to the maximum extent permitted by law;

      bb.   *Additional Relief*: Grant any other further legal or equitable relief the Court deems just, equitable, and proper, including, where appropriate, constructive trust, accounting, or other equitable remedies.

## **JURY TRIAL REQUESTED**

    Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: December 8, 2025

LOEVY & LOEVY

/s/ Ross Kimbarovsky

_____

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek    (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs David Woulard, Attack the Sound LLC, Stan Burjek, James Burjek, Berk Ergoz, Hamza Jilani, Maatkara Wilson, Arjun Singh, Magnus Fiennes, and Michael Mell.*